[Crim. No. 20190. Second Dist., Div. Five. July 5, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
MERVEL BLAKESLEY, Defendant and Appellant.

## COUNSEL

Clifford Douglas, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, William E. James, Assistant Attorney General, and Bernardine M. Baldwin, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**KAUS, P. J.**—In a three-count information filed March 26, 1970, defendant was charged with oral copulation (Pen. Code, § 288a) in count I, sodomy (Pen. Code, § 286) in count II, and contributing to the delinquency of a minor (Pen. Code, § 272) in count III. Defendant pleaded not guilty. Trial was by jury.

Following the presentation of the People's case in chief, counts I and II of the information were dismissed pursuant to section 1118.1 of the Penal Code. Defendant was found guilty of count III. After it was determined that defendant was not a mentally disordered sex offender, proceedings were suspended and defendant was granted probation for five years, the first thirty days to be spent in the county jail.

The complaining witness, David, testified to a series of homosexual contacts with defendant beginning in early 1968, and continuing until late 1969. These involved a number of incidents of kissing and fondling, masturbating in the presence of one another, one incident of oral copulation, and one of anal intercourse.

Cross-examination of David was prolonged, covering about 60 pages of transcript. In the main it constituted a series of attacks on his credibility. Thus the cross-examination developed:

a. that David had had a homosexual experience with his brother before meeting defendant;

b. that another such incident could have happened after David met defendant, though David had no specific recollection thereof;

c. that David had had three blackouts after he first met defendant;

d. that while David was in the hospital for the treatment of ulcers in August of 1969 he had seen a psychiatrist;[1]

e. that David harbored a conflict within himself by virtue of which he could not "determine whether [he] wanted to stay in a small world and have people tell [him] what to do or [whether] in fact [he] wanted to break out and be [himself]";

f. that David did not reveal his relationship with defendant to the psychiatrist;

g. that in fact he had denied any such relationship to various doctors;[2]

h. that David had read books with homosexual themes;

i. that it did not particularly bother David to discuss homosexuality with people;

j. that once he had become sufficiently angry at defendant over being ordered to sleep in a station wagon at night—during which night defendant had placed his hands on David's penis—that he complained to his scout master about it;

k. that at one point he had denied part of defendant's alleged sexual misconduct when questioned by a bishop of the Mormon church, then admitted the misconduct and then retracted the admission;

l. that he had asked defendant for money on a number of occasions; that there were discussions concerning the criminal consequences for his and defendant's conduct between them, but that he did not obtain the money as a result of any threats of exposure;[3]

m. that he got angry at defendant about 20 times during their relationship; that when he discontinued the relationship in November 1969, shortly before he reported it, he was not "actually angry" at defendant, but he was "hurt";

n. that a short time after his relationship with defendant had ended, he wrote a suicide note which he showed to various people and left on the

---

[1]This interview apparently did not take place at David's request, but was ordered after certain other tests performed while David was at the hospital, indicated its advisability.

[2]In spite of the fact that the evidence thrust of the cross-examination of David was impeachment, certain matters that were elicited were also admissible on the merits. (Evid. Code, § 1235.)

[3]We set forth only attempted impeachment which produced results. Naturally, whether it should or not, the mere asking of certain questions even if it resulted in denials, could have made a certain impression on the jury.

desk of one of his teachers, although he did not in fact intend to commit suicide.

For the purpose of showing certain contradictions the defense read several passages from David's preliminary hearing testimony into the record. Also it called his parents as witnesses, apparently for the main purpose of proving that David had consulted psychiatrists.

While David was still under cross-examination the People called Doctor Wodinsky, a psychiatrist who had examined David pursuant to court order. (*Ballard* v. *Superior Court*, 64 Cal.2d 159, 171-177 [49 Cal.Rptr. 302, 410 P.2d 838, 18 A.L.R.3d 1416].) As soon as the People's intention to call the doctor was made known, there ensued a lengthy chambers discussion concerning the admissibility of his testimony.[4] Challenged to state whether the doctor was being produced to rehabilitate David as a witness, the prosecutor said: "Right:" he intended "to use Doctor Wodinsky as a stabilizing force to rehabilitate [David] in that area,[5] and for credibility." After some discussion with respect to whether or not the doctor's testimony would be admissible on the merits under section 1103 of the Evidence Code,[6] the court eventually ruled that the doctor could testify, but that he would not be allowed to give "an opinion on the jury's function."

Doctor Wodinsky then testified that David was mentally disturbed in the sense that "adolescents are all mentally disturbed people." David did not, however, show any serious psychopathology. Homosexuality did not indicate psychopathology or a serious mental disturbance. David's suicide note did not change the doctor's views.

■ Defendant's first contention on appeal is that the psychiatric testimony was improperly received. His main argument is that the doctor's

---

[4] It appeared that the People were having some difficulty scheduling the doctor's testimony. Defense counsel preceded his objection by stating that he did not object to the doctor testifying "whenever he gets here, out of order, regardless of what stage we are in." At that point it had already become quite apparent that the defense would attack David's credibility. We interpret counsel's remark to mean that the admissibility of the doctor's testimony could be viewed as if he were offered by the People in rebuttal.

[5] Just what the prosecutor meant by "that area" is not too clear. He had mentioned that at the preliminary hearing David had been cross-examined about numerous items and medical records and "things like that."

[6] "In a criminal action, evidence of the character or a trait of character (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct) of the victim of the crime for which the defendant is being prosecuted is not made inadmissible by Section 1101 if such evidence is:

"(a) Offered by the defendant to prove conduct of the victim in conformity with such character or trait of character.

"(b) Offered by the prosecution to rebut evidence adduced by the defendant under subdivision (a)." (Evid. Code, § 1103.)

testimony was "in the nature of a general rehabilitation effort," rather than specifically directed at rebutting any specific attack on David's credibility by showing the effect of a specific medical or psychiatric condition on his ability to tell the truth.[7]

The law appellant relies on is a certain statement in *People* v. *Russel,* 69 Cal.2d 187, 196 [70 Cal.Rptr. 210, 443 P.2d 794].[8] On its face the passage from *Russel* referred to is applicable to rehabilitation of a witness, as well as to impeachment. True, it is generally impermissible to rehabilitate a witness' credibility, until it has been attacked. (Evid. Code, §§ 790, 791.) Further, rehabilitation is impermissible if "[t]he defense does not meet the assault." (McCormick, Evidence (2d ed. 1972) § 49, p. 105.) That, however, presented no problem here:[9] though the attack on David's credibility had many facets, clearly one of its aims was to depict him as a mentally sick individual. The purpose of calling Doctor Wodinsky was merely to put his sickness into proper psychiatric perspective.[10]

[7]It is not, nor has it ever been, claimed that Doctor Wodinsky was appointed to aid trial counsel in the preparation of his case. (Evid. Code, §§ 952, 1017; see *People* v. *Aikin,* 19 Cal.App.3d 685, 694-697 [97 Cal.Rptr. 251]; cf. *City & County of S. F.* v. *Superior Court,* 37 Cal.2d 227, 234-235 [231 P.2d 26, 25 A.L.R.2d 1418].) No question concerning the lawyer-client privilege is therefore involved.

[8]"Thus, it must be determined from the offer of proof and, if necessary, from *voir dire* examination, if the evidence sought to be introduced bears upon the matter at issue, to wit, the *credibility* of the complaining witness— *by showing the effect of a particular mental or emotional condition upon her ability to tell the truth.* In addition, the evidence offered must be examined with a view to ensuring that the knowledge which it represents can be effectively communicated to the jury; evidence studded with arcane terms is of no benefit to a lay fact-finding body. Further, the court should make a determination as to whether the examination which is the basis of the evidence utilized techniques of general scientific acceptance and was sufficiently thorough to facilitate a reliable opinion. Finally, the evidence should be examined with a view to preserving the integrity of the jury as the finder of facts: expert opinion is admitted in this area in order to inform the jury of the effect of a certain medical condition upon the ability of the witness to tell the truth—*not in order to decide for the jury whether the witness was or was not telling the truth on a particular occasion.*" (*People* v. *Russel,* 69 Cal.2d at p. 196. Italics ours.)

[9]See also footnote 4, *supra.*

[10]Defendant can hardly complain that the doctor's testimony was not sufficiently pointed in the direction of rehabilitating David as a witness, as distinguished from describing him as a generally normal adolescent. This was undoubtedly the result of the court's ruling that the doctor was not to give an opinion on the "jury's function," which defendant had obtained before the doctor testified. As a matter of fact the doctor's testimony on direct examination which pictured David as nothing worse than a normal mixed-up adolescent was very favorable to the defense, in that most jurors would think it unlikely that the average adolescent would engage in the type of conduct described by David, particularly with a man evidently old enough to be his father. It was only the cross-examination conducted by the defense which developed that the doctor attached little or no psychiatric importance to David's ventures into homosexuality.

The real, if not quite articulated, basis for the objection to Doctor Wodinsky's testimony seems to be that the privilege of calling a doctor who has examined the victim to a sex crime is a one-way street. We hold that it is not.

 As noted counts I and II were dismissed under section 1118.1 of the Penal Code, the trial court ruling that any conviction on those counts would violate section 1111 of the Penal Code requiring corroboration of accomplice testimony. Defendant argues that the uncorroborated evidence of the acts charged in counts I and II should have been stricken from the jury's consideration as to count III. He unsuccessfully moved the trial court for a ruling to that effect.

The first reason defendant advances is that the acts charged in counts I and II were alleged in the information to have occurred "on or about" dates different from those indicated by the evidence. The information charges that the violation of section 288a of the Penal Code occurred on or about June 16, 1969, and that the violation of section 286 of the Penal Code occurred on or about September 15, 1969. David's testimony was that the violation of section 288a occurred on approximately June 22, 1969, and that the violation of section 286 occurred approximately September 15 or 17.[11]

Section 955 of the Penal Code provides the complete answer to this argument. It says that the offense "may be alleged to have been committed at any time before the finding or filing [of the accusatory pleading], except where the time is a material ingredient in the offense." No prejudice resulting from the slight variance has ever been claimed. (*People* v. *Wrigley,* 69 Cal.2d 149, 155 [70 Cal.Rptr. 116, 443 P.2d 580].)[12]

The next reason advanced for excluding from consideration as to count III the evidence of the acts charged in counts I and II is equally without merit. Defendant recognizes that the complaining witness is not an accomplice to the crime charged in count III—contributing to the delinquency of a minor—and that corroboration of the minor's testimony is thus not required to support a conviction. (*People* v. *Lucas,* 16 Cal.2d 178, 180-181 [105 P.2d 102, 130 A.L.R. 1485]; *People* v. *Risley,* 213 Cal.App.2d

---

[11]These dates were well within the one-year period of limitations applicable to section 272 of the Penal Code. (Pen. Code, § 801; *People* v. *Cruse,* 24 Cal.App. 497, 502 [141 P. 936].)

[12]More to the point than the complaint that is made, would be to point out that the date on which defendant is alleged to have committed the charge made in count III is November 20, 1969, a date which, as far as the record shows, the prosecutor picked by throwing darts at a wall calendar. Again, however, no prejudice is shown or even claimed.

219, 227 [28 Cal.Rptr. 568]; *People* v. *Doetschman,* 69 Cal.App.2d 486, 489-490 [159 P.2d 418].) He seizes, however, upon a dictum in *Risley, supra,* to support his contention.

In *Risley* the defendant was charged with oral copulation and statutory rape. He was eventually convicted of oral copulation and contributing as a lesser included offense to the charge of statutory rape. The victims were female. The court held that there need be no corroborating evidence for the charge of contributing, adding: "She [the victim] could not be convicted of either rape upon herself or of contributing to her own delinquency." (*People* v. *Risley, supra,* 213 Cal.App.2d at p. 227.)

Here, defendant urges, the situation is different. While the complaining witness in *Risley* could not have been an accomplice, David was determined by the trial court to have been an accomplice as a matter of law.

Defendant is asking that the settled rule that no corroboration is needed, be modified now so that corroboration would be required for any testimony as to acts which, if charged as different crimes, would require corroborating testimony. No reason beyond the advantage to the defendant is advanced in support of this modification. The rule that a teenager and a mature adult can be accomplices as to certain sex crimes is technical enough. We are not disposed to broaden it.

■ Defendant finally argues that the evidence relating to the acts charged in counts I and II should have been stricken pursuant to the court's discretion under section 352 of the Evidence Code. We are not referred to any reliance on section 352 below. Nor, obviously, would it have been an abuse of discretion to refuse to strike this evidence, highly relevant to the crime charged in count III, in spite of a claim of prejudice under section 352. To be sure, the evidence hurt. It may even have been fatal. However prejudice and detriment are not interchangeable concepts. (*Gonzales* v. *Brennan,* 238 Cal.App.2d 69, 75-76 [47 Cal.Rptr. 501].)

The judgment is affirmed.

Stephens, J., and Cole, J.,* concurred.

---

*Assigned by the Chairman of the Judicial Council.