[No. D004675. Fourth Dist., Div. One. July 29, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
LEROY ANTHONY BOWKER, Defendant and Appellant.

**COUNSEL**

Roberta K. Thyfault, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Michael D. Wellington, Frederick R. Millar, Jr., and Louis R. Hanoian, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**WIENER, Acting P. J.**—A jury convicted Leroy Anthony Bowker of seven counts of lewd and lascivious acts with a child under fourteen years of age (Pen. Code, § 288, subd. (a)) and two counts of oral copulation with a child under fourteen years of age (Pen. Code, § 288a, subd. (c)). We decide the court erred in allowing a psychologist to testify on the "child sexual abuse accommodation syndrome." As we shall explain, Supreme Court precedent requires that expert testimony related to the syndrome be narrowly confined, subject to a proper foundational showing that such evidence is necessary to rebut popular misconceptions which would challenge the victim's credibility. After the testimony has been received, the jury must be

admonished so that it understands the limited purpose for admitting such evidence. Here the expert's testimony exceeded the permissible limits without the necessary safeguards. We decide the error was harmless, however, and accordingly affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Ten-year-old Tonya B. and her nine-year-old brother Byron B. lived with their mother in National City. Their immediate neighbors for about six years were Bowker and his seventy-eight-year-old mother. In the summer of 1985 the children began playing at Bowker's house and accompanying him to a nearby cemetery used as a route to school and playground by the neighborhood children. On September 27, 1985, Tonya told Mrs. B. that Bowker had touched her on the side of the "butt." Byron said he had not been touched by Bowker, but he had seen Bowker touch Tonya. Mrs. B. called the authorities, which resulted in interviews by the sheriff's department and later physical examinations and interviews by Children's Hospital staff.

At trial examining physicians testified Tonya had vaginal and anal injuries consistent with trauma over about a six-month period of time and Byron had injuries to the anus consistent with multiple episodes of penetration with a foreign object. At the time of the children's examination Mrs. B. became very distraught. Tonya and Byron were placed in a foster home. The children gave inconsistent accounts of what happened to them. At various times Tonya reported Bowker had touched her only twice, then four times, and later reported ten touchings. Tonya was unclear where Bowker had touched her and denied that she had been touched inside or outside her anus. Byron reported Bowker had put his penis in Byron's anus five or six times at the graveyard and Bowker's house.

A neighbor boy, second-grader David B. (no relation), also testified. He remembered on one occasion seeing Bowker and Byron in a secluded part of the cemetery behind some bamboo. Neither one had his pants on.

Bowker denied ever touching Tonya or Byron. He could not understand why the children accused him. The defense elicited statements from the children that some form of sexual conduct had occurred between the children and a baby-sitter named Cheryl.

Bowker objected to any expert testimony on the child sexual abuse accommodation syndrome as irrelevant and unduly prejudicial. The prosecution claimed expert testimony by psychologist Dr. Raymond Murphy was

admissible to "assist the jury" and to "explain [children's] behavior."[1] After an Evidence Code section 402[2] hearing, the court ruled the psychologist's testimony was admissible if limited to child sexual abuse victims as a class and only if Tonya's and Byron's credibility was put in question.

Counsel for Bowker asked the jury be admonished "that this psychologist is not being asked if these children are telling the truth or if the children in general that show these characteristics are telling the truth." However the only limiting instruction given by the court was: "I want to make clear to you, ladies and gentlemen of the jury, that he will not, repeat, not be expressing any opinion as to the children in this case. He has not examined the children in this case. . . . [¶] He will not be testifying as to whether the children in this case were molested or not. That will not be the area of his testimony. [¶] What he will be testifying about is whether—it's with regard to the conduct of alleged victims of child abuse as a class."

Dr. Murphy testified at great length on the "child abuse accommodation syndrome." He explained in detail each of the five stages of the syndrome theory. Stage one is secrecy, an element inherent in the adult-child relationship, where a child understands certain things should not be disclosed. Stage two is helplessness, the absence of power a child has in a relationship with a parental figure or trusted adult. The first two stages are present in every child and establish a child's potential to become a victim of sexual abuse. Stages three through five occur as the result of abuse. Entrapment and accommodation, the third stage, occurs after the child fails to seek protection. Stage four, delayed disclosure, occurs when the child tells someone about the sexual abuse. In retraction, the final stage, the child denies abuse has occurred.[3] Murphy also explained the origin of the syndrome theory as a therapeutic tool and its usefulness: "Anyone who has to interact with the child, including parents, police department, social workers, attorneys, would be benefitted by knowing this syndrome and understanding the conditions of childhood victimization."

When asked about a child's ability to disclose abuse, Dr. Murphy volunteered "It is very important that a young child, say, any age from four to ten, 12 years old, that they be believed." In answer to a question about why a child would doubt that the interviewers believe what the child has told

---

[1] The prosecution relied on *People* v. *Payan* (Cal.App.). *Payan,* however, had been ordered depublished by the Supreme Court on January 30, 1986, 10 days before trial.

[2] A hearing conducted out of the presence of the jury to determine the question of admissibility of evidence.

[3] The theory of child sexual abuse accommodation syndrome was first delineated by Roland Summit. See Summit, *The Child Sexual Abuse Accommodation Syndrome* (1983) 7 Int'l. J. of Child Abuse & Neglect 177. See also Comment, *The Admissibility of "Child Sexual Abuse Accommodation Syndrome" in California Criminal Courts* (1986) 17 Pacific L.J. 1361.

them, Murphy responded as a hypothetical child: " 'If they believe me, why are they taking me away from my mom? If they believe me in here, why are they bringing me in here? How many times do I have to say it? I told the lady at the hospital, the policeman, I told the detective, I told the guy downtown in the suit, and they took me into this big courtroom.' I hear this all the time. It is very hard. Little kids are not used to being on the stand." Dr. Murphy volunteered: "The most important person that can say 'It wasn't your fault, it was my fault,' is the perpetrator. That person never gets a chance to say it. The system doesn't allow that either, many times." He testified while children give inconsistent versions of what happened to them, inconsistency is commonplace and should not invalidate a child's response.

## DISCUSSION

Opinion testimony by experts has long generated controversy in both civil and criminal trials. Even the most casual observer of the legal scene is aware of the crucial and often determinative weight an expert's opinion may carry. ■ Like other evidence, expert testimony must be relevant and competent on a material issue, subject to exclusion, however, if unduly prejudicial. (3 Witkin, Evidence (3d ed. 1986) Introduction of Evidence at Trial § 1681, p. 1642.) Evidence Code section 801 prescribes two specific preconditions to the admissibility of expert opinion testimony. The testimony must be of assistance to the trier of fact and must be reliable. (Evid. Code, § 801.) The opinion of the expert will assist the fact finder if the subject of inquiry is "sufficiently beyond common experience." ■ The "reliable matter" upon which an expert's opinion must be based varies with each particular subject.[4]

The issue in this case concerns the second requirement in section 801. California adopted the *Frye* [5] standard of reliability to determine the admissibility of new scientific methods of proof in *People* v. *Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240] (*Kelly-Frye*.) ■ A scientific technique utilized by an expert witness must " 'be *sufficiently established to have gained general acceptance in the particular field in which it belongs.*' " (*Id.* at p. 30, quoting *Frye* v. *United States, supra,* 293 Fed. 1013, 1014.) By restricting the expert to generally accepted scientific techniques, the fact finder is protected from being misled by the "aura of infallibility" of unproven and ultimately unscientific methods. (*People* v. *McDonald* (1984) 37 Cal.3d 351 [208 Cal.Rptr. 236, 690 P.2d 709, 46 A.L.R.4th 1011].)

---

[4] The word "matter" is used to encompass facts, data, and such matters as a witness's knowledge, experience, and other tangibles upon which an opinion may be based. Thus, every conceivable basis for an opinion is included within this term. (See Cal. Law Revision Com. com., Deering's Ann. Evid. Code (1986 ed.) § 801, pp. 8-9.)

[5] *Frye* v. *United States* (D.C. Cir. 1923) 293 Fed. 1013.

Which particular evidence is deemed "scientific" and therefore subject to the general acceptance test is frequently disputed.[6] However, the *Kelly-Frye* rule is "deeply ingrained" and applies not only to the more obvious polygraph, voiceprint, and blood-typing techniques but also to scientific processes based on purely psychological evidence. (*People* v. *Shirley* (1982) 31 Cal.3d 18, 51-53 [181 Cal.Rptr. 243, 641 P.2d 775].)

In *People* v. *Bledsoe* (1984) 36 Cal.3d 236 [203 Cal.Rptr. 450, 681 P.2d 291], the Supreme Court applied *Kelly-Frye* to exclude expert psychological testimony based on the "rape-trauma syndrome." The court held the syndrome did not meet the *Kelly-Frye* requirement because it was "not relied on in [the scientific] community for the purpose for which the prosecution sought to use it . . . ." (*Id.* at p. 251.) Expert testimony that the complaining witness was suffering from rape trauma syndrome was inadmissible to show a rape had actually occurred because the syndrome was developed as a "therapeutic tool" and not to determine the " 'truth' or 'accuracy' of a particular past event." (*Id.* at p. 249.)

The court in *Bledsoe* suggested that even though rape trauma syndrome failed the *Kelly-Frye* test, evidence related to the syndrome could be admissible to "disabus[e] the jury of some widely held misconceptions about rape and rape victims, so that it may evaluate the evidence free of the constraints of popular myths." (36 Cal.3d at pp. 247-248.) Where the alleged rapist has suggested that conduct of the victim is inconsistent with having been raped, rape trauma syndrome evidence has been "introduced to rebut such an inference by providing the jury with recent findings of professional research on the subject of a victim's reaction to sexual assault." (*Id.* at p. 247.)

██ Relying on *Bledsoe,* numerous Court of Appeal decisions have held that *Kelly-Frye* similarly precludes an expert from testifying based on the child sexual abuse accommodation syndrome (CSAAS) that a particular victim's report of alleged abuse is credible because the victim manifests certain defined characteristics which are generally exhibited by abused children. (See *In re Sara M.* (1987) 194 Cal.App.3d 585, 593 [239 Cal.Rptr. 605]; *Seering* v. *Dept. of Social Services* (1987) 194 Cal.App.3d 298, 310-311, 313 [239 Cal.Rptr. 422]; *People* v. *Roscoe* (1985) 168 Cal.App.3d 1093, 1099 [215 Cal.Rptr. 45]; *People* v. *Willoughby* (1985) 164 Cal.App.3d 1054, 1069 [210 Cal.Rptr. 880].) ██ The Attorney General proffers no basis upon which we can rationally distinguish CSAAS from the rape trauma syndrome in this regard.[7] (See *Bledsoe, supra,* 36 Cal.3d at p. 247, fn.

---

[6]See Giannelli, *Scientific Evidence* (1986) Section 1-5(E), page 25 for criticism of the *Frye* test.

[7]The suggestion that language in *People* v. *McDonald, supra,* 37 Cal.3d 351 is inconsistent with *Bledsoe's* application of the *Kelly-Frye* standard may be an interesting academic musing but, given our role as an intermediate appellate court, it is irrelevant to the decision of this

7, *In re Sara M., supra,* 194 Cal.App.3d 585, 591-592 and fn. 5.) ■ Dr. Murphy's testimony itself suggested that CSAAS, like the rape trauma syndrome, was developed as a therapeutic tool. (See *In re Sara M., supra,* 194 Cal.App.3d at p. 593.) In any event, there was no evidence presented to the trial court which would support the notion that CSAAS may be properly and accurately used to determine when a child has been abused. (See *Seering* v. *Dept. of Social Services, supra,* 194 Cal.App.3d at p. 313.)

■ The issue we must confront, therefore, is whether Dr. Murphy's testimony runs afoul of the general *Bledsoe-based* rule prohibiting expert reference to CSAAS for the purpose of demonstrating abuse, or whether it falls within the *Bledsoe* exception which permits such testimony for the limited purpose of disabusing the jury of misconceptions as to how child victims react to abuse.[8]

Defining the limits of the *Bledsoe* exception is not an easy task. There is at least potential tension in a rule which would reject CSAAS testimony when offered in the main case but allow similar evidence if presented for rebuttal purposes. We are not alone in noting this tension: "[C]ourts which subjected the testimony to searching inquiries regarding relevance, unfair prejudice, the *Frye* rule, etc. when it was offered in the case-in-chief to prove that the crime occurred, often, without explanation, treated the testimony much more leniently when it was offered in rebuttal to explain the unusual behavior of the complainant." (McCord, *Expert Psychological Testimony About Child Complainants in Sexual Abuse Prosecutions: A Foray Into the Admissibility of Novel Psychological Evidence* (1986) 77 J. Crim. L. & Criminology 1, 64, n. 317.)

The Attorney General's argument only heightens this tension. Relying largely on *People* v. *Roscoe, supra,* 168 Cal.App.3d 1093, he asserts the sole

case. We are bound by *Bledsoe* unless it was overruled in *McDonald*. (See *Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].) *McDonald,* decided less than six months after *Bledsoe,* approvingly cites the earlier case for its principle and distinguishes its facts. (*McDonald, supra,* 37 Cal.3d at p. 373.) There is no basis for concluding *Bledsoe* has been overruled.

Moreover, *McDonald* is perfectly consistent with *Bledsoe* because the scientific evidence sought to be admitted in *McDonald* was not subject to misuse by the jury for a purpose not generally accepted within the scientific community. Arguably had such misuse been possible, a *Kelly-Frye* issue akin to *Bledsoe* would have been presented.

[8] Although reference to "CSAAS evidence" in the context of the *Bledsoe* exception is a convenient shorthand, it is arguably misleading. Detailed testimony describing the syndrome itself is neither relevant nor necessary to rebut the sorts of misconceptions referred to in *Bledsoe*. The syndrome assumes the child is a "legitimate victim" of sexual abuse; its purpose is to explain why such victims exhibit certain types of behavior so as to assist psychology professionals in providing therapy and treatment. (See Summit, *The Child Sexual Abuse Accommodation Syndrome, supra,* 7 Int'l J. of Child Abuse & Neglect 177, 179-180.) An expert has little need to refer to the syndrome in order to testify that a particular type of behavior is not inconsistent with a child having been abused.

effect of *Bledsoe* as applied to CSAAS evidence is to prohibit experts from testifying that the particular victim was abused. He contends the same testimony is admissible as long as the expert's remarks are confined to the class of abuse victims in general. (*Roscoe, supra,* 168 Cal.App.3d at pp. 1099-1100.) In our view, however, this argument misconstrues the rationale underlying *Bledsoe* and reads *Roscoe* far too broadly. The Supreme Court cannot have intended the *Bledsoe* exception to give with one hand what had been previously taken away by the other.

Fundamentally, *Bledsoe* must be read to reject the use of CSAAS evidence as a *predictor* of child abuse. It is one thing to say that child abuse victims often exhibit a certain characteristic or that a particular behavior is not inconsistent with a child having been molested. It is quite another to conclude that where a child meets certain criteria, we can predict with a reasonable degree of certainty that he or she has been abused. The former may be appropriate in some circumstances; the latter—given the current state of scientific knowledge—clearly is not.

While the impropriety in the latter situation is clearest where the expert's testimony applies the CSAAS theory to the facts of the case and concludes that the victim was molested, it is also present where the expert gives "general" testimony describing the components of the syndrome in such a way as to allow the jury to apply the syndrome to the facts of the case and conclude the child was sexually abused. In fact, there may be more danger where the application is left to the jury because the jurors' education and training may not have sensitized them to the dangers of drawing predictive conclusions. The expert may be aware that although victims of child abuse generally exhibit a particular type of behavior, that behavior is also found in significant numbers of children who have not been molested. The jury may not be similarly cognizant.

The question remains how best to apply the *Bledsoe* exception so as to provide the jury with relevant, accurate information regarding "recent findings of professional research on the subject of a victim's reaction to [child abuse]" (*Bledsoe, supra,* 36 Cal.3d at p. 247) without the danger that such information will be misapplied as a predictive index by the jury. In our view, several limitations must be observed. First of all, the evidence must be tailored to the purpose for which it is being received. *Bledsoe* does not make "general" testimony on CSAAS admissible in every, or for that matter any, child abuse case. Although *Bledsoe* can be read to prohibit CSAAS testimony unless it is being used to rebut a defendant's attack on the credibility of the alleged victim(s),[9] at a minimum the evidence must be targeted to a

---

[9] In rejecting any suggestion that the rape trauma evidence was admitted to rebut a challenge to the victim's credibility, the *Bledsoe* court observed "defendant made no claim that

specific "myth" or "misconception" suggested by the evidence. (*Bledsoe, supra,* 36 Cal.3d at pp. 247-248.) For instance, where a child delays a significant period of time before reporting an incident or pattern of abuse, an expert could testify that such delayed reporting is not inconsistent with the secretive environment often created by an abuser who occupies a position of trust. Where an alleged victim recants his story in whole or in part, a psychologist could testify on the basis of past research that such behavior is not an uncommon response for an abused child who is seeking to remove himself or herself from the pressure created by police investigations and subsequent court proceedings. In the typical criminal case, however, it is the People's burden to identify the myth or misconception the evidence is designed to rebut. Where there is no danger of jury confusion, there is simply no need for the expert testimony. (*Bledsoe, supra,* 36 Cal.3d at p. 248.)

Beyond the tailoring of the evidence itself, the jury must be instructed simply and directly that the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true. The jurors must understand that CSAAS research approaches the issue from a perspective opposite to that of the jury. CSAAS *assumes* a molestation has occurred and seeks to describe and explain common reactions of children to the experience. (See *In re Sara M., supra,* 194 Cal.App.3d at p. 593.) The evidence is admissible *solely* for the purpose of showing that the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested.

█ Turning to the facts of this case, it is clear the prosecutor led Dr. Murphy on a testimonial excursion which far exceeded the permissible limits of the *Bledsoe* exception. The evidence was offered during the prosecution's case-in-chief, suggesting that its purpose was not to rebut defense attacks on the credibility of Tonya and Byron. (See *In re Sara M., supra,* 194 Cal.App.3d at p. 591.) Dr. Murphy's testimony accounted for nearly 70 pages of reporter's transcript and was replete with comments designed to elicit sympathy for child abuse victims and solicitations that children should be believed. Murphy in effect said regardless how inconsistent a child's accounts of abuse are, abused children give inconsistent accounts and are credible nonetheless. Moreover, the picture painted by Murphy happened to be of the two children in the case. His comment, "Why are they taking me away from my mom?" directly coincided with the fact that as a result of the investigation Tonya and Byron were removed from their mother's home and placed in foster care. He expressed how frightening it was "for a child to come into *this* courtroom, and I know they have to, and tell their story." (Italics added.)

Melanie's conduct or demeanor after the incident provided any basis for the jury to infer that she had not been raped." (36 Cal.3d at p. 248.)

More importantly, by delineating each stage of the CSAAS theory, Murphy constructed a "scientific" framework into which the jury could pigeonhole the facts of the case. Thus, even though he was precluded from using CSAAS as a predictor of child abuse, the jury was free to superimpose these children on the same theory and conclude abuse had occurred. The prosecution was not circumspect in using syndrome evidence as shown by the colloquy between the prosecutor and Dr. Murphy:

"Q. Finally, Dr. Murphy, going back to the questions about what precisely the purpose or the use of this syndrome is. [¶] Dr. Summit doesn't say—I believe you said that Dr. Summit doesn't say in his article that with this in hand you can now interview a child and diagnose specifically whether that child was molested or not.

"A. No, he doesn't say that.

"Q. Can it nevertheless to you as a psychotherapist or to a therapist or for that matter, possibly to a police officer, can it nevertheless be helpful for that person to understand whether or not they feel that the child was molested?

"A. If you're asking whether or not it would help a person make a decision as to whether a child is being—whether a child's behavior is consistent with molest, yes." These questions and answers highlight the fact that Murphy testified to more than the "popular myths" which might have affected the jury in their deliberations.

We cannot conclude, however, it is reasonably probable a verdict more favorable to Bowker would have resulted had Dr. Murphy's testimony been properly limited. To the extent the jury relied on CSAAS to conclude Tonya and Byron had been molested, other evidence would likely have yielded the same conclusion. David B., the neighbor boy, stated that he saw Bowker and Byron in the graveyard behind some bamboo without their pants on. Two physicians testified to the physical evidence which corroborated the children's claims they had been molested. Moreover, Bowker's defense in part accepted that conclusion, suggesting the children may have been molested by someone else, perhaps a former baby-sitter named Cheryl. We think it unlikely that the overbreadth of Dr. Murphy's testimony was a critical factor in establishing Bowker's guilt. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

DISPOSITION

Judgment affirmed.

Work, J., concurred.

BENKE, J.—Concurring in result. I agree an affirmance is compelled in this case. However, I believe my colleagues have unnecessarily, and I re-

spectfully submit incorrectly, restricted the use of expert testimony offered on the "child sexual abuse accommodation syndrome" (CSAAS).

I

The majority opinion concludes *Kelly-Frye*[1] and *People* v. *Bledsoe* (1984) 36 Cal.3d 236 [203 Cal.Rptr. 450, 681 P.2d 291], when read together serve to exclude general evidence concerning CSAAS. It concludes that only where introduction of a specific element of the syndrome is necessary in order to disabuse a myth or misconception concerning sexual abuse does the syndrome become admissible and then only the specific element may be presented to the jury.

Underlying the majority's holding is its conclusion expert testimony is not admissible unless it is "necessary" and, where "necessity" does not appear, such testimony is irrelevant and thus inadmissible.

While academic debate may exist on the issue (see 1 Witkin, Cal. Evidence (3d ed. 1986) The Opinion Rule, § 475, p. 447), the test employed to determine admissibility of expert testimony is not, as the majority suggests in this case, whether the evidence is somehow "necessary" but whether the proffered evidence will be of any assistance or appreciable help to the fact finder.

Evidence Code section 801, subdivison (a), is quite clear. Expert opinion is admissible when it is "Related to a subject that is sufficiently beyond common experience that the opinion of an expert *would assist* the trier of fact." (Italics added.)

In criticizing case law which had engrafted a rule of necessity on Evidence Code section 801, subdivision (a), our Supreme Court has stated: "[Section 801, subdivision (a)] does not flatly limit expert opinion testimony to subjects 'beyond common experience'; rather, it limits such testimony to such subjects '*sufficiently* beyond common experience *that the opinion of an expert would assist the trier of fact*' (italics added). The emphasized words . . . make it clear that the admissibility of expert opinion is a question of degree. The jury need not be wholly ignorant of the subject matter of the opinion in order to justify its admission; if that were the test, little expert opinion testimony would ever be heard. Instead, the statute declares that even if the jury has some knowledge of the matter, expert opinion may be admitted whenever it would 'assist' the jury. *It will be excluded only when it would add nothing at all to the jury's common fund of information,* i.e., when 'the subject of inquiry is one of such common knowledge that men of

---

[1] *People* v. *Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240]; *Frye* v. *United States* (D.C. Cir. 1923) 293 Fed. 1013.

ordinary education could reach a conclusion as intelligently as the witness' (*People* v. *Cole* (1956) 47 Cal.2d 99 [301 P.2d 854, 56 A.L.R.2d 1435] . . .)." (*People* v. *McDonald* (1984) 37 Cal.3d 351, 367 [208 Cal.Rptr. 236, 690 P.2d 709, 46 A.L.R.4th 1011], italics added.)

Consistent with the majority's reliance on a test of necessity is its conclusion that where it cannot be demonstrated the particular jury is in need of education regarding a specific myth regarding child sexual abuse, such evidence is not relevant and is therefore inadmissible. I find this a novel approach to the concept of relevance, and one which I respectfully submit is inconsistent with existing rules of evidence. Evidence Code section 210 defines relevant evidence as evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." This broad definition of relevance is not limited or expanded by the jury's need for particular information. Nor is it limited by a determination of what potential misconceptions of the evidence a given jury might have. (See 1 Witkin, Cal. Evidence (3d ed. 1986) Circumstantial Evidence, § 287, pp. 256-257.)

The definitional premises offered by the majority opinion lead, in my view, to an overly restrictive use of expert testimony. I believe existing California law permits a court to decide in any given case whether expert medical testimony concerning the existence of a syndrome would be of general assistance to the jury, free of the impediments now placed upon it by this court.

Moreover, I do not share my colleagues' concern that syndrome evidence will be misused as a "predictor" of a condition which will necessarily misguide the fact finder. A "syndrome" is nothing more than a set of symptoms which tend to occur together. (Sloan-Dorland Annot. Medical-Legal Dict. (1987) p. 686.) The existence of such symptoms in the annals of medical literature does not necessarily "predict" anything. Where syndrome evidence is admitted, the parties are free to test the existence of the syndrome and whether the facts of the case are consistent with the syndrome. The majority's concern that the jury will be improperly swayed by such evidence is one which portrays an overly pessimistic view of the jury system. Indeed, such factual determinations are best left to the fact-finding processes at trial, processes by which I believe the judge and jury can adequately examine the validity of specific medical testimony.

Unlike the majority, I am unconcerned that some elements of a syndrome may or may not be applicable in a given case. The applicability of a syndrome can be adequately determined by a fact finder with the assistance of able counsel.

## II

In addition to my disagreement with the premises of the majority's opinion, I respectfully disagree with my colleagues' application of the *Kelly-Frye* rule and interpretation of the *Bledsoe* decision.

## A

Despite a plethora of case authority and textual materials on the subject, *Kelly-Frye* remains an elusive and inconsistently applied component in evidentiary law. It has variously been defined as a test applicable to "scientific evidence" rather than "expert medical opinion" (*People* v. *McDonald, supra,* 37 Cal.3d 351, 373), "new scientific process operating on purely psychological evidence" (*People* v. *Shirley* (1982) 31 Cal.3d 18, 53 [181 Cal.Rptr. 243, 641 P.2d 775]), expert medical opinion used to enhance the truth-finding process rather than to rehabilitate a victim (*People* v. *Bledsoe, supra,* 36 Cal.3d 236, 249) and any new scientific method of proof to which "factfinders would 'tend to ascribe an inordinately high degree of certainty'" (*In re Amber B.* (1987) 191 Cal.App.3d 682, 690-691 [236 Cal.Rptr. 623]). It is amazing any trial court can determine what the test is and on what evidentiary basis it rests, let alone apply it.

To this milieu we add *People* v. *McDonald, supra,* 37 Cal.3d 351. There, the defendant had offered the testimony of a medical expert on the psychological factors which may affect the accuracy of eyewitness identification. While he did not propose to offer an opinion as to the validity of any identification offered by particular witnesses at trial, he did wish to set forth in some detail the medical-psychological processes he believed were involved. He thus attempted to outline for the jury a "three-stage identification process." The trial court, however, held the testimony inadmissible as failing to pass the *Kelly-Frye* analysis.

In reversing the lower court, the Supreme Court stated: "Here, . . . no [unproven and ultimately unsound scientific] methods are in issue. *We have never applied the Kelly-Frye rule to expert medical testimony, even when the witness is a psychiatrist and the subject matter is as esoteric as the reconstitution of a past state of mind or the prediction of future dangerousness, or even the diagnosis of an unusual form of mental illness not listed in the diagnostic manual of the American Psychiatric Association (People* v. *Phillips* (1981) 122 Cal.App.3d 69, 86-87 [175 Cal.Rptr. 703] . . . ('Munchausen's syndrome by proxy')). We see no reason to require a greater foundation when the witness is a qualified psychologist who will simply explain to the jury how certain aspects of everyday experience shown by the record can affect human perception and memory, and through them, the accuracy of

eyewitness identification testimony." (*People* v. *McDonald, supra,* 37 Cal.3d at p. 373, italics added.)

Applying the principles set forth in *McDonald,* it is clear that CSAAS, much like theories of identification process, is a medical theory formulated by medical experience and opinion. CSAAS is not an experiment and no results of experiments need be relayed to the jury. Nor is a "medical procedure," as that term is used in *McDonald,* employed.

If expert medical opinion regarding CSAAS is to be subjected to the *Kelly-Frye* test, that test would logically extend into all areas of expert opinion, including those involving psychological evaluation of individuals.

Aside from running afoul of the clear language of *McDonald,* the dangers inherent in such an extension are obvious. The application of the *Kelly-Frye* test would become overly burdensome, overly hypertechnical and even more inconsistently applied, precisely the grounds upon which the test has been challenged.[2] I believe the majority opinion, in applying *Kelly-Frye* to expert medical opinion, opens the door to such abuses and contributes to the kind of criticism which can only function to hasten the demise of an otherwise useful tool by which we can assimilate evergrowing and increasingly complex bodies of scientific evidence into our legal structure.

### B

Nor do I believe the *Bledsoe* decision alone or in combination with *Kelly-Frye* necessarily compels the result reached by the majority.

With due respect to my colleagues and those critics and decisions debating perceived internal inconsistency created by an application of the *Kelly-Frye* test in *Bledsoe,* I am not confident the *Bledsoe* opinion rests upon a

---

[2] The *Kelly-Frye* test has been harshly criticized for its ambiguity, inconsistent application, inflexible nature and needless rejection of relevant evidence. (Giannelli, *The Admissibility of Novel Scientific Evidence: Frye v. United States, a Half-Century Later* (1980) 80 Columbia L.Rev. 1197, 1204-1223; McCormick, *Scientific Evidence: Defining a New Approach to Admissibility* (1982) 67 Iowa L.Rev. 879, 882-885; Imwinkelried, *The Standard for Admitting Scientific Evidence—A Critique From the Prospective of Juror Psychology* (1983) 100 Mil. L.Rev. 99, 102-107.) Its continued vitality has been questioned in *United States* v. *Downing* (1985) 753 F.2d 1224, 1234; see Giannelli, *Novel Scientific Evidence, supra,* at pp. 1228-1229; Weinstein & Berger, 3 Weinstein's Evidence, ¶ 702[03] pp. 702-15 to 705-21. The rule has recently been rejected in Oregon, which elected a more flexible criteria for admitting novel scientific evidence. (See, e.g., *State* v. *Brown,* (1984) 297 Ore. 404 [687 P.2d 751, 754].)

We clearly add inconsistency here, for while we now hold CSAAS is subject to a *Kelly-Frye* analysis, clear existing authority holds the battered child syndrome and Munchausen's syndrome are not subject to the *Kelly-Frye* test. (*People* v. *Phillips* (1981) 122 Cal.App.3d 69, 87 [175 Cal.Rptr. 703]; *People* v. *Jackson* (1971) 18 Cal.App.3d 504; *Landeros* v. *Flood* (1976) 17 Cal.3d 399, 409 [131 Cal.Rptr. 69, 551 P.2d 389, 97 A.L.R.3d 324] [95 Cal.Rptr. 872]; *People* v. *Steger* (1976) 16 Cal.3d 539, 549, fn. 4 [128 Cal.Rptr. 161, 546 P.2d 665, 83 A.L.R.3d 1206].)

strict *Kelly-Frye* analysis. Indeed a close reading of the *Bledsoe* decision reflects that while the issues were framed by the parties as *Kelly-Frye* issues and while the court in *Bledsoe* gestures toward a *Kelly-Frye* analysis, *Bledsoe* never comes to grips with whether *Kelly-Frey* applies and does not rest its decision on a conclusion that general syndrome evidence is to be admitted or not admitted depending upon its general acceptance in the scientific community. Indeed to have rested *Bledsoe* on *Kelly-Frye* would have been to create inconsistency with *McDonald* and expand *Kelly-Frye* into the realm of expert testimony. Thus, while *Bledsoe* contains ambiguity it is ambiguity which I believe may serve a purpose.

I would adopt a far more simple view of the *Bledsoe* decision, one by which it remains both internally consistent and consistent with existing law.

Closely examined, *Bledsoe* holds that the rape trauma syndrome has only been used by the scientific community as a therapeutic device. The court concludes the syndrome was never intended as a device which could be used to determine whether the individual involved had actually been raped. It had no truth-finding function. In an analysis *similar* to that used in *Kelly-Frye,* the court reasoned that since the medical profession itself employed a limited use for the rape trauma syndrome, the prosecution could not exceed that use and introduce the syndrome to demonstrate that in fact, a particular complainant had been raped. Such would be a misuse of the syndrome.

Instead, using what appears to me to be a simple test of balancing prejudice against probative value (Evid. Code, § 352), the Supreme Court found the prejudice caused by the introduction of such evidence far outweighed the probative value due to the great likelihood the jury would actually misapply the evidence and use it to determine an issue for which the syndrome was never intended to apply.

However, the court held that if the defendant challenges a complainant's credibility by urging a victim of rape would not act in the manner the complainant did, the prosecutor might then introduce evidence of the syndrome to demonstrate the medical profession has identified a syndrome which assumes assault in order to overcome popular myths surrounding the conduct of rape victims.

Viewed in this light *Bledsoe* does not create a "rule" and an "exception." It is but a traditional application of section 352 as it relates to expert testimony. Moreover, such an interpretation of *Bledsoe* clearly permits introduction of general syndrome evidence. Indeed, nothing in *Bledsoe* suggests general syndrome evidence is inadmissible. Rather, consistent with the holding in *McDonald,* expert testimony concerning a medical syndrome remains admissible if it meets the general test of assistance to the jury on an issue which is before the fact finder. In *Bledsoe,* of course, the syndrome

would have been of no assistance to the jury on the issue of guilt, the only purpose for which it had been offered.

## C

In any event, whatever inconsistency one may find in *Bledsoe,* here Dr. Murphy did no more than offer medical testimony concerning a school of medical thought. He made no reference to the children alleged to have been molested, and, as was the situation in *People* v. *Gray* (1986) 187 Cal.App.3d 213 [231 Cal.Rptr. 658], the testimony was introduced to rehabilitate the victim's testimony and was thus pertinent to the question of credibility.[3] (*Id.* at pp. 217-225; *People* v. *Roscoe* (1985) 168 Cal.App.3d 1093, 1100 [215 Cal.Rptr. 45].) As in *Gray,* while the rehabilitation occurred during the People's case-in-chief, it was, nonetheless, rehabilitative testimony which need not await the rebuttal stage of trial. (See, e.g., *People* v. *Blakesley* (1972) 26 Cal.App.3d 723, 728 [102 Cal.Rptr. 885].)

It is for the foregoing reasons I would affirm the judgment.

A petition for a rehearing was denied August 18, 1988, and the opinion was modified on August 29, 1988, to read as printed above. The petitions of both parties for review by the Supreme Court were denied November 10, 1988.

---

[3] Tonya denied that appellant had touched her anywhere other than the outside of her vagina. On direct examination she stated that she had been touched only once. However, on cross-examination she said that the touching occurred four times. She continued to assert that she had been touched very quickly. On redirect, she stated that she had also been touched on the right side of her bottom, but denied that she had been touched inside or outside her anus. This was contrary to the testimony she gave at the preliminary hearing.