Filed 12/12/23  P. v. Magana CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>EDGAR RUIZ MAGANA,<br><br>    Defendant and Appellant. | E079625<br><br>(Super.Ct.No. RIF2101539)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  Timothy J. Hollenhorst, Judge.  Affirmed.

Spolin Law, Aaron Spolin, Jeremy M. Cutcher and Erica B. Esquivel for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal, Andrew Mestman, Eric Tran and Joshua Trinh, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury convicted Edgar Ruiz Magana of committing numerous sexual offenses against his minor daughter, Jane Doe. On appeal, he argues that the trial court prejudicially erred by admitting expert testimony about child sexual abuse accommodation syndrome. We reject the argument and affirm the judgment.

BACKGROUND

In January 2021, when Doe was 10 years old, Doe told her cousin Denise D. that her father (Magana) had "sexually abused" Doe when she was younger. Denise called the police.

A detective assigned to investigate scheduled a forensic interview of Doe that was conducted in mid-February 2021. The detective interviewed Magana in April. During the interview, the detective offered Magana an opportunity to write an apology letter to Doe. The detective left the room and watched Magana from an observation room. Magana wrote for a while and then crumpled up the piece of paper on which he was writing and tossed it into a trash can. The detective retrieved the letter from the trash can.

The letter reads: "I apologize, [Doe]. I love you a lot. I'm sorry for not being able to defend you. You're the engine that keeps me going and I'm glad you didn't stay quiet. Don't worry about me. You're okay with your aunt so they can help you. I'm okay. I'm sorry if I did something wrong to you. I don't . . . ."

Magana was charged by information with two counts of engaging in sexual intercourse or sodomy with a child under age 10 (Pen. Code, § 288.7, subd. (a)) and one

2

count of engaging in lewd or lascivious conduct with a child under age 14 (Pen. Code, § 288, subd. (b)(1).)

Doe testified at trial, when she was 11 years old. A video recording of the forensic interview conducted the year before (when Doe was 10) was played for the jury, and a transcript of the interview was provided to the jury. At trial, Doe described three incidents in which Magana touched her or made her touch him when she was between five and eight years old. Doe told the forensic interviewer that she remembered three incidents but only described the first and last incidents.

When Doe was somewhere between five and seven years old, Magana walked into the bathroom after Doe finished using the toilet. Magana asked Doe if she needed help wiping, and she responded that she did. While Doe was standing and facing the mirror, Magana stood behind her and "pretend[ed] to wipe." Doe felt something "hard, but squishy at the same time," which Doe explained was Magana's "private part"—the part of the body from which he urinated. Doe told the forensic interviewer that Magana attempted to put his "private" "inside her private, but since [she] was little it didn't really, you know, fit." It hurt Doe when Magana "tr[ied] to push it in." Doe told the forensic interviewer that Doe's "private" meant the part of the body from which she urinated. Doe testified that when Magana wiped her it felt different "on [her] private," meaning the place where she "go[es] No. 2." Doe felt something "weird on [her] bottom." Doe yelled "stop" because it hurt and because in the mirror she could see what Magana was doing, even though he "tried to hide his private from" her. Magana covered Doe's mouth with

3

his hand and threatened to take her into the room and hit her with a belt. Magana said "'I'm done,'" and he then put his belt back on and pulled up his pants.

The second incident that Doe described at trial occurred after the bathroom incident, but Doe could not recall her age. Doe and Magana slept in the same bedroom, which they shared with an uncle of Doe's, whom Doe described as "a special kid, like a special ed. kid." When Doe and Magana were going to sleep, Magana told Doe to hold his hand. Doe complied, "but it didn't feel like a hand" based on Doe's experience of holding her dad's hand at stores. The shape of what Doe grabbed "felt like a thumb sort of." The bedroom lights were off. Doe "held it for like a couple minutes, and then—and then [she] let it go." Magana did not say anything to her. Doe's uncle was in the room on his bed. Doe did not tell the forensic interviewer about the incident and instead told the interviewer that Magana had never asked Doe to do something to his body.

The third incident occurred when Doe was seven or eight years old. All of Doe's family members except her uncle had left the house to go eat. Doe's uncle was eating in the kitchen. Magana grabbed Doe's wrist and brought her into the bedroom and closed the door. Magana pulled Doe's shirt up and touched and rubbed the bare skin on her "chest area" with his hands. Magana also removed Doe's pants and lowered her underwear to her knees. Magana "tried to put his private"—"[t]he one he pees with"— "in [her] private," meaning her "pee private." At first, Magana and Doe were standing and facing each other, but then Magana backed Doe onto the bed so that she was seated on it, while he remained standing in front of her. Doe did not see Magana's "private" but

4

could feel pushing and pressure "[a]round where [she] pee[s]."  "It really hurt" Doe. Magana "just ran out" of the bedroom after Doe heard some noise outside of the bedroom.

Doe was afraid and confused.  During the encounter, Magana told Doe that she "better not tell anyone, or—or you know what's gonna happen," which Doe believed "meant that he was gonna hit [her] with the belt, like he did the first time."

The first person that Doe told about what had happened with Magana was a 17-year-old male cousin, who in turn told Doe to tell Denise.  Doe had been talking to her male cousin about her parents' divorce, and "it slipped out."  Doe had otherwise attempted "to be friends with" Magana because she "just wanted to forget all that happened."  Doe told the forensic interviewer that at some unspecified time before talking to her cousins, she had twice threatened to commit suicide.

In February 2021, Dr. Sophia Grant, a physician and the medical director for the sexual assault and forensic evaluation team at a hospital, conducted a sexual assault examination of Doe.  Doe reported to Dr. Grant that Magana had fondled her breasts. Asked whether Magana had penetrated Doe's vagina with his penis, Doe said, "'Yes,'" and "'It went in just a little.'"  Doe had experienced pain.  Doe told Dr. Grant that Magana had threatened to "'hit [Doe] with a belt if [she] ever said anything.'"

Dr. Grant did not find any physical evidence of abuse in her examination of Doe. Dr. Grant explained that the lack of physical evidence was what she expected because of Doe's delayed disclosure and the fact that the penetration may have been partial.

5

Dr. Grant explained that female genitals heal rapidly, so in cases involving delayed disclosure "it is very common to not have any sign of injury."

Dr. Veronica A. Thomas, Ph.D., a clinical and forensic psychologist, testified for the prosecution. She explained that child victims of sexual assault do not always report abuse and that most of those who do report the abuse do not do so immediately. Dr. Thomas opined that delayed disclosures are common with child victims of sexual abuse, "especially with regard to molesting that happens over time." Children often delay disclosure because the majority of children "are molested by somebody they know" and with whom "they have an ongoing relationship," thus causing the victims to experience intense "emotional complications," such as "[g]uilt, responsibility, sadness, grief, anger, [and] not being believed."

Dr. Thomas opined that discrepant disclosures—disclosures that are inconsistent or evolve over time—are also common with child victims of sexual abuse. Child molestation victims often repress the details of the abuse because the memories are "just too emotionally overwhelming to understand." Dr. Thomas also opined that child victims of sexual abuse commonly confuse the details of various incidents.

Magana testified on his own behalf. He claimed that he had never placed his penis in Doe's vaginal area, rubbed her chest in an inappropriate manner, or attempted "to do any of those things that she described when she testified." Several of Magana's family members testified on his behalf.

6

The jury convicted Magana on all counts.  The court sentenced him to an aggregate sentence of 58 years to life in state prison.

DISCUSSION

Magana's sole argument is that the trial court prejudicially erred by admitting expert testimony about child sexual abuse accommodation syndrome.  We find no error.

A.  *Legal Framework*

Evidence Code section 801 provides that when a witness testifies as an expert, the witness's opinion testimony must be "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).)  "'The trial court has broad discretion in deciding whether to admit or exclude expert testimony [citation], and its decision as to whether expert testimony meets the standard for admissibility is subject to review for abuse of discretion.'"  (*People v. Jones* (2013) 57 Cal.4th 899, 946.)

B.  *Relevant Proceedings*

The prosecution moved in limine to admit evidence of child sexual abuse accommodation syndrome.  The prosecution proffered that because of Doe's delayed disclosure and the existence of "positive aspects to their relationship" with Magana, the testimony would dispel myths about why a child would not disclose immediately "and why a child may not be able to come forward with details in a manner that most would expect of an adult."

7

At a pretrial hearing on the motion, the judge asked the prosecutor if she was seeking to admit the child sexual abuse accommodation syndrome testimony so that the expert could discuss the general behaviors of children who have been sexually abused, including "why sometimes children don't report right away." The prosecutor agreed that the purpose of the expert testimony was to explain delayed disclosure in child sexual abuse victims "as well as what a jury may perceive as self-impeaching behavior based on the continued familial relationship that in this case the victim and defendant have."

Defense counsel acknowledged that expert testimony on child sexual abuse accommodation syndrome is common in cases like this, but counsel nevertheless objected on the following basis: Dr. Thomas "has not been involved whatsoever in this exact case. So, essentially, what the proposed witness is going to do is talk in generalities about how sometimes this happens, but sometimes it doesn't happen. So sometimes there is delayed reporting, sometimes there is not. And I agree with that. That doesn't assist the jury in making any decisions. [¶] This is a–this is an area that is not subject to scientific analysis. There is no way to do experiments like we do in chemistry or physics. So, in my view, it's pseudoscience. They come in here with an inflated degree, or I should say with a degree of respect and credibility that is inflated by their degree. Everyone defers to them, calls them doctor and so forth, they're not scientists. [¶] This is antidotes and opinions. It's like saying I'm an expert on criminology because I talk to a lot of criminals. It doesn't make any sense. So I'm against it. I think that it's pseudoscience. I

8

believe that it misleads the jury. Any information that the expert provides to the jury does not assist the jury in reaching a just verdict, so I object for those reasons."

The trial court granted the prosecution's motion and overruled defense counsel's objection, reasoning that the testimony would be "extraordinarily helpful" to the jurors.

C. *Analysis*

Relying on *People v. Bowker* (1988) 203 Cal.App.3d 385 (*Bowker*), Magana argues that the trial court abused its discretion by admitting Dr. Thomas's testimony, because the prosecution failed to carry its burden of identifying the specific myth or misconception harbored by the jury that the evidence was designed to rebut. The argument lacks merit.

Magana's objection in the trial court to the admission of Dr. Thomas's testimony was not based on the argument he is making on appeal. We consequently consider the argument forfeited. (*People v. Seijas* (2005) 36 Cal.4th 291, 301 ["'questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal'"].)

Even if not forfeited, the argument is unsound. In *Bowker*, the prosecution proffered expert testimony on child sexual abuse accommodation syndrome "to 'assist the jury' and to 'explain [children's] behavior.'" (*Bowker*, *supra*, 203 Cal.App.3d at p. 389.) *Bowker* held that in general such testimony is inadmissible for the purpose of demonstrating that a particular child has been abused, but child sexual abuse accommodation syndrome testimony is generally admissible "for the limited purpose of

9

disabusing the jury of misconceptions as to how child victims react to abuse." (*Id.* at p. 392.) *Bowker* stated that such "evidence must be targeted to a specific 'myth' or 'misconception' suggested by the evidence" (*id.* at pp. 393-394), and that "it is the People's burden to identify the myth or misconception the evidence is designed to rebut" (*id.* at p. 394).

Subsequent case law has held that "[i]dentifying a 'myth' or 'misconception'" does not require "the prosecution to expressly state on the record the evidence which is inconsistent with the finding of molestation." (*People v. Patino* (1994) 26 Cal.App.4th 1737, 1744.) Instead, "[i]t is sufficient if the victim's credibility is placed in issue due to the paradoxical behavior, including a delay in reporting a molestation." (*Id.* at pp. 1744-1745; *People v. Harlan* (1990) 222 Cal.App.3d 439, 449-450 (*Harlan*).)

The prosecution carried that burden in the present case. In its motion and at the pretrial hearing, the prosecution proffered that the expert testimony on child sexual abuse accommodation syndrome was necessary because Doe had delayed reporting the abuse and had continued to maintain a relationship with Magana. The evidence introduced at trial aligned with the prosecution's earlier proffer—the testimony showed that Doe had delayed reporting and maintained her relationship with Magana despite the abuse.

In *Harlan*, *supra*, 222 Cal.App.3d 439, the prosecution made a similar showing, and this court held that it was sufficient to justify admission of the expert's testimony on child sexual abuse accommodation syndrome. (*Id.* at pp. 449-450.) *Harlan* reasoned: "Unlike in *Bowker*, [*supra*, 203 Cal.App.3d 385], the prosecutor here explicitly identified

the misconceptions about victims' behavior, i.e., delayed disclosure and inconsistent statements, which the testimony was intended to rebut." (*Ibid.*) *Harlan* is directly on point, and we see no reason to depart from this court's precedent. (*Estate of Sapp* (2019) 36 Cal.App.5th 86, 109, fn. 9.)

We accordingly conclude that the trial court did not abuse its discretion by admitting Dr. Thomas's testimony about child sexual abuse accommodation syndrome. (*Harlan*, *supra*, 222 Cal.App.3d at p. 450.)

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ _____
J.

We concur:

FIELDS _____
Acting P. J.
RAPHAEL _____
J.

11