Filed 3/12/13  P. v. Bluitt CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B240225 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YA080766) |
| v. | |
| JERRY AUGUSTA BLUITT, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Eric C. Taylor, Judge.  Affirmed as modified.

Vanessa Place, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr., Supervising Deputy Attorney General, and Rama R. Maline, Deputy Attorney General, for Plaintiff and Respondent.

_____

The jury convicted defendant and appellant Jerry Augusta Bluitt in count 1 of oral copulation/sexual penetration with a child under 10 years old (Pen. Code, § 288.7, subd. (b))[1] and in count 2 of committing a lewd act upon a child (§ 288, subd. (a)). The trial court sentenced defendant to 15 years to life on count 1 and a concurrent 8-year term on count 2.

On appeal, defendant contends the trial court abused its discretion in admitting evidence of prior sexual offenses, expert testimony concerning Child Sexual Abuse Accommodation Syndrome, and transcripts of "jail calls." He also argues that admission of this evidence violated his constitutional rights to equal protection, due process, and a fair trial. Finally, he contends the trial court erred when it failed to stay his sentence in count 2 pursuant to California Penal Code section 654, a claim properly conceded by the Attorney General.

We modify the judgment to stay the sentence in count 2, and in all other respects the judgment is affirmed.

## FACTS

### I. Prosecution

#### A. *The Incident and Investigation*

On December 29, 2010, D.D.'s mother, Latrice W., dropped her off at her grandmother Yvonne B's house before going to work. Latrice W. was not aware that defendant, who had a prior conviction for sexual battery (§ 243.4) and annoying or molesting a child under the age of 18 (§ 243.4), was at the house. Defendant is D.D.'s uncle on her father's side of the family. At the time of the incident, D.D. was 10 years old.

---

[1] All statutory references are to the Penal Code, unless otherwise indicated.

2

Yvonne B. (who is defendant's mother) was not feeling well, so she told D.D. to go into the living room to watch TV. D.D. went to the bathroom and noticed that defendant was at the house. Defendant told her he had movies they could watch, so she went into his room. They talked about the Bible and watched a movie. Defendant had snacks in his room, and he allowed D.D. to have hot chocolate.

Yvonne B. was suffering from back pain and was taking Vicodin three times a day. She took Vicodin at around 11:00 a.m. and went to bed to rest, where she stayed for most of the day.

Around the time that she took the Vicodin, Yvonne B. asked defendant to run some errands for her. Defendant and D.D. went out together. Defendant bought D.D. candy at her request.

When they returned, defendant took a lottery ticket he had purchased to Yvonne B. Then he and D.D. went back into his room to watch another movie, but the disc was not working. Instead, they talked about the movie Blood Diamond. D.D. said the movie was bad because "they were shooting African people, and they was smoking." Defendant asked D.D. if she smoked. She answered that she did not. Defendant lit a cigarette and put it in D.D.'s mouth. She coughed and threw it to the ground.

Defendant told D.D. to come over to where he was sitting on the bed. Defendant did not respond when she asked why. He told her to pull down her pants. D.D. was shocked that her uncle would say this to her, and she asked him why he wanted her to do it. He did not answer. After D.D. complied, defendant licked the inside of her "private part[s]." D.D. pulled up her pants and asked defendant why he had done that to her. Defendant told her not to tell her parents because he would get into trouble. He told her that he did the same thing to his girlfriends. D.D. was disgusted.

Yvonne B. came into defendant's room and asked if they wanted hamburgers. D.D. and defendant said they did, so she gave defendant her credit card to buy them. As defendant was leaving, D.D. went into the bathroom, brushed her teeth, and wiped herself, because her mouth tasted like cigarettes and she felt "icky."

3

D.D. walked into her grandmother's room, and Yvonne B. asked her why she was brushing her teeth. She asked twice because D.D. did not respond the first time. Eventually, D.D. said that she did not really want to say. Yvonne B. asked her what she meant and D.D. said she did not want to get "him" into trouble. Yvonne B. asked her what she was talking about, and D.D. just repeated that she did not want to get "him" in trouble.

Yvonne B. asked her what she was talking about again. She responded that defendant let her smoke a cigarette. Yvonne B. asked if she was sure, and she said yes. D.D. then revealed that defendant had licked her "privates." Yvonne B. again asked if she was sure, and she said yes. D.D. had not told her grandmother what happened until defendant left because she was afraid.

Yvonne B. called defendant and repeated what D.D. had told her. Defendant responded that he did not know why D.D. would say such things. Yvonne B. told defendant to come home immediately. She then called D.D.'s mother and the police.

Defendant returned to the house a few minutes later and asked D.D. why she told her grandmother what she did and said "you know I didn't do that." D.D. responded, "yes, you did," and repeated what she had told her grandmother.

Latrice W. drove to Yvonne B.'s apartment as soon as she spoke with her on the phone. She confronted defendant and took D.D. home. Defendant said he was going to the police station.

D.D. was taken to the Gardena Police Department, where she was interviewed by Officer Evans. Afterwards, D.D.'s mother took her to the hospital, where she was examined by Nurse Hare, a member of SART. D.D. told Nurse Hare that defendant licked her twice, yelled at her to pull her pants down, and put a cigarette in her mouth. D.D. reported that she had urinated and wiped herself twice since the incident, but that she had not showered.

Nurse Hare did a comprehensive medical examination of D.D., used a black light to scan her body, and took swabs from her cheek, vulva, and vestibule. D.D.'s exam was normal, with no indications of trauma or trace evidence on her body. Nurse Hare

4

testified that in her opinion the absence of DNA evidence was consistent with D.D.'s account of the incident, taking into account that D.D. had urinated and wiped herself twice.

Defendant was arrested by Gardena Police Detective Daniel Guzzo on the day of the incident. Detective Guzzo recovered two packs of Newport cigarettes from him. Defendant provided an oral reference sample. A DNA analyst compared the sample to the vaginal swabs taken from D.D. and did not find a DNA match.

### B. *Expert Testimony*

Dr. Jayme Bernfield, a clinical psychologist who worked with victims of sexual and physical abuse, testified about Child Sexual Abuse Accommodation Syndrome (CSAAS). Dr. Bernfield explained that CSAAS is a five-part model, which explains the dynamics of sexual abuse and victims' coping mechanisms. The goal of CSAAS is to help parents understand their child's reaction to sexual abuse from the child's perspective. Children often fail to disclose abuse, which can be confusing to their parents. The five parts of CSAAS are secrecy, helplessness, accommodation, delayed disclosure, and retraction. Secrecy describes the circumstances of the abuse, which occurs when the victim and the abuser are alone, without witnesses. Helplessness explains why a child complies with an adult abuser. Children are helpless both because of their inferior size compared to adults and because they have been taught to do what they are told. A child who has a close relationship with an adult will feel powerless to prevent sexual abuse. Accommodation describes the mechanisms children use to tolerate the situation even though they do not like what is happening to them. Delayed disclosure is typical, although this may be counterintuitive to people who have not suffered abuse. Many children never disclose that they have been abused, or only disclose it gradually. Victims often maintain secrecy into adulthood. Retraction occurs where the victim lacks support or suffers negative consequences after disclosing sexual abuse. If the abuse occurs over a significant period of time, victims are more likely to blame themselves.

5

## C. *Prior Sexual Offenses*

C.E. testified that defendant had abused her as a child. C.E. is defendant's second cousin.[2] Defendant lived with C.E.'s family as an "in-house babysitter" when C.E. was seven years old. He took care of C.E. and her two sisters at night when their mother and stepfather were at work. He slept on the couch at C.E.'s house and also stayed with the mother of his children some nights.

On the nights that defendant took care of C.E. and her sisters, he took C.E. out of the room she shared with her sisters and put her on the couch where he slept. He would remove her clothing, orally copulate her, digitally penetrate her, and attempt to kiss her on the mouth. C.E. was terrified the first time he abused her. When defendant digitally penetrated C.E., it hurt because he had long fingernails. On one occasion, he rubbed his penis on her vagina. When C.E. opened her eyes he would tell her to go back to sleep or say that she was dreaming. The abuse went on for a couple of years and occurred on a regular basis.

At some point, defendant moved in with a woman named Raquel. C.E. met Raquel and her daughter Jamila through defendant. When defendant began staying at Raquel's house more frequently, C.E. asked Jamila if he touched her. Jamila answered, "No." After defendant moved in with Raquel, he only babysat for C.E. and her sisters a few more times. He touched her and orally copulated her some of those times.

C.E. told her best friend and cousin what defendant had done to her around the time of the abuse, when she was seven or eight years old. She did not disclose what happened to anyone else until she told her grandmother and sisters in 2009, when she was 21 or 22 years old. C.E. told her mother what happened after defendant was put in jail in connection with the present case.

---

[2]    C.E. is defendant's aunt's granddaughter.

M.T. also testified that defendant had abused her as a child. Defendant lived with M.T. and her family when M.T. was approximately nine years old. M.T. was friends with C.E.

Defendant's sexual abuse of M.T. began when she was nine years old. M.T. leaned on defendant while they were watching TV one day. That night, defendant took her out of bed and put her on the couch. He made her touch his chest with her hand, and then used her hand to rub his penis. M.T. pulled her hand away. Defendant put his penis next to her vagina. He asked her if she wanted him to stop and she said yes. He stopped, but warned her not to tell anyone. Defendant said he thought M.T. liked him because she had been leaning on him earlier. He told M.T. that he would give her a special doughnut if she kept the incident secret. The next morning, he did give her the special doughnut.

M.T. told her mother what had happened after defendant stopped living with her family. She had been afraid to tell her mother about the incident earlier because defendant told her she would get into trouble if she did.

Jamila V. testified that defendant sexually abused her. Jamila was eight years old and living with her Aunt Raquel.[3] M.T. and Jamila's cousin T. were also living with Raquel at the time. Jamila was friends with C.E.

Defendant babysat for Jamila and M.T. One night, when Raquel was at work, defendant came into Jamila's room and got on top of her. Defendant tried to kiss Jamila twice, but she pushed him away and kept her mouth closed. Defendant pulled her pants down and rubbed his penis on the outside of Jamila's vagina. She told him to stop, but he shushed her. At that moment, Raquel came home. Defendant told Jamila to put her clothes on and not say anything. She did not tell anyone what happened because defendant told her she would get in trouble if she did.

Defendant moved into Racquel's house a few weeks after the incident. He began touching Jamila inappropriately about every other day, during the day and at night. On

_____

[3]    Jamila was very close with her Aunt Raquel and referred to her as "mom," which is likely why C.E. testified that Jamila was Raquel's daughter.

7

one occasion, he got into the shower behind Jamila and touched her vagina. Another time he put his penis inside her vagina, which hurt her. Defendant licked Jamila's vagina and made her sit very close to him so that he could touch her. Jamila was afraid when he touched her. Defendant gave Jamila special candies that he did not give to the other children and let her sit on his lap and drive his car as long as she promised that she would not tell anyone what he was doing to her.

Defendant moved away, but then returned to live in Raquel's house when Jamila was about 12 years old. When defendant returned, the sexual abuse resumed. Defendant gave her toys and told her not to tell anyone.

Although M.T. told Jamila what defendant had done to her, Jamila did not say anything about the abuse she had suffered because she was afraid of what people would think. Defendant had warned her that she would get in trouble if she told anyone, and she believed him.

On April 14, 2003, defendant was convicted of sexual battery against Jamila (§ 243.4) and annoying or molesting a child under 18 against M.T. (§ 647.6) in San Joaquin County. Defendant had not been charged with any offense with respect to C.E. at the time of the trial in this case.

### D. *Jail Calls*

Defendant made phone calls from jail that were introduced at trial. The first was to Yvonne B., his mother, on January 28, 2011. Defendant told his mother that D.D. twice testified that he "shoved a cigarette in her mouth," pulled down her pants, and licked her vagina. He accused D.D. of lying and then told his mother that D.D. had also testified that he bought her candy and told her not to tell anyone what happened. He accused D.D. of attempting to instigate inappropriate sexual interactions between them and using "filthy" and "nasty" language, against his protests. Defendant swore that he rebuffed D.D. and admonished her that she was being inappropriate, but that she continued in her advances. D.D. told defendant that she wanted him to show her his

8

penis. She also pulled down her pants and told him to lick her vagina twice, making sure that her grandmother did not detect her in between advances.

Yvonne B. told defendant that D.D. had come into her room earlier that day and told her she loved him. She asked him if he was sure that D.D. asked to see his penis, and he swore that she did. Yvonne B. asked why he had not told D.D. to leave the room. Defendant explained that he was on the phone with a friend when she approached him. Defendant reiterated that D.D. had accused him of telling her to pull her pants down multiple times in the conversation.

The second phone call that was introduced was between defendant and K.B., C.E.'s mother, on April 6, 2011. Defendant wanted to know how C.E. was going to testify because the district attorney had told him she was another possible victim. K.B. did not say whether she knew C.E. was testifying but offered defendant her address if he wanted to write to her. Defendant said, "[K.B], I know I said I didn't did [*sic*] anything, but this time I didn't do anything. [D.D.] made those advances and I shot her down." He told K.B. his version of events in detail, emphasizing that he told D.D. to stop her behavior and that he threatened to tell her mother what she had done. He said that D.D. was lying and told four different versions of the events to different people. He accused D.D. of setting him up several times and stated that he had been "living [his] life straight" for the last seven and a half years. He told K.B. that everything depended on what C.E. was going to say on the witness stand, and that C.E. could really "put a dagger in [him]." Defendant said he was trying to find out what C.E. would say. K.B. told him to take care and the call ended.

## II. Defense

### A. *Defendant's Testimony*

Defendant testified that he was reading the Bible in his room at his mother's house when D.D. arrived on December 29, 2010. He came out of his room at some point and

9

noticed that D.D. was there. About 25 minutes later, D.D. knocked on his door and defendant told her to come in. D.D. came into the room and was about to close the door, but defendant told her to leave it open. She sat down on a chair next to the television, and they talked about the Bible.

D.D. noticed a photo of defendant's baby and remarked that the baby was cute. She then asked if he had heard about a 34-year-old man who molested a three-month-old baby. Defendant said he had not heard about it.

Defendant went outside to smoke, and D.D. followed him. She asked why he went outside and he explained that he did not want to smoke in front of her. They watched a movie and talked about another movie called "Blood Diamond." D.D. said she liked the movie but that the children in it were bad because they were shooting and smoking. D.D. asked defendant if cigarettes were bad for you and he said they were. She picked up a burnt cigarette and twirled it in her fingers.

When the movie ended, Yvonne B. asked him to go to the store and the bank for her. D.D. went to the store with defendant. Yvonne B. had told him to ask D.D. if she wanted anything, and she asked for candy, so he bought some for her with his mother's debit card.

When they got back to the apartment, defendant went into Yvonne B.'s room, and then returned to his own room and called his friend on the phone. D.D. also went to defendant's room and was sitting in the chair next to the television. Yvonne B. asked him to go out again to get food at McDonald's.

D.D. asked defendant if his kids dated and had sex at her age. He told her it was not appropriate. She then leaned over and whispered that she wanted him to show her his penis. Defendant said that she should watch her mouth and told her she was being inappropriate. She responded that he probably would not molest her anyway. He said he would not. Defendant did not tell D.D. to leave his room because he was distracted by his phone conversation.

D.D. then got up, walked over to the bed, pulled her pants down, and told defendant to "lick it." Defendant told her to pull her pants up or he would get in trouble.

10

She pulled up her pants and left his room briefly, but then returned, pulled down her pants, and told him to "lick it" again. Defendant said that if he licked her private parts he would be molesting her. He told D.D. that he was going to tell her grandmother about her behavior. D.D. pulled up her pants.

Defendant got up and went to get his mother's debit card to go to McDonald's. When he came back to his room, D.D. was crying. He asked her what was wrong, but she did not want to tell him. He left for McDonald's.

Yvonne B. called him while he was driving to McDonald's and told him that D.D. told her what he had done. He asked what she was talking about, and she said D.D. had told her he made her smoke a cigarette and licked her vagina. Defendant was incredulous. He went back to the apartment immediately.

When he got back to the apartment, defendant asked D.D. why she would say those things. Latrice W. came to the apartment and got into a confrontation with defendant. He denied any wrongdoing. Latrice W. took D.D. and left.

Defendant went directly to the police department. He told Detective Guzzo what had happened. He voluntarily gave a DNA sample and offered to take a polygraph test. He denied doing anything inappropriate to D.D. He told the detective that he had not told his mother what D.D. said to him because she had a bad heart.

Defendant testified that he called K.B. from jail because the public defender told him that C.E. was another alleged victim. He wanted to know what C.E. was accusing him of, but K.B. did not know. Defendant said he made the comment about C.E. putting a dagger in him because an accusation against him would be very bad for his case. Defendant and his wife and two kids lived with C.E.'s family for two or three months, but he never babysat for her when he was there. He never touched C.E. sexually or said anything inappropriate to her.

Defendant denied that he ever touched M.T. inappropriately. He admitted that he rubbed Jamila's genital area on her 13th birthday when they were wrestling. He explained that he was intoxicated when it happened, and that he had never touched Jamila inappropriately other than during this one incident.

11

## DISCUSSION

**Evidence Admitted Under Evidence Code Sections 1101 and 1108**

Defendant first argues that the trial court abused its discretion in admitting evidence of prior sexual offenses committed against C.E., M.T., and Jamila pursuant to Evidence Code sections 1101, subdivision (b), and 1108, because the evidence lacked sufficient probative value and was unduly prejudicial. We find defendant's argument unavailing.

Evidence Code section 1101, subdivision (b) permits the introduction of evidence that "a person committed a crime, civil wrong or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than his or her disposition to commit such an act." Evidence Code section 1108, subdivision (a) provides that "[i]n a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by [Evidence Code s]ection 1101, if the evidence is not inadmissible pursuant to [Evidence code s]ection 352." In effect, Evidence Code section 1108 "assure[s] that the trier of fact [is] made aware of the defendant's other sex offenses in evaluating the victim's and the defendant's credibility. In this regard, [Evidence Code] section 1108 implicitly abrogates prior decisions . . . indicating that 'propensity' evidence is per se unduly prejudicial to the defense. [Citation.]" (*People v. Falsetta* (1999) 21 Cal.4th 903, 911 (*Falsetta*).)

Because the trial court admitted the prior offense testimony under both Evidence Code sections 1101, subdivision (b), and 1108, error exists only if the testimony is inadmissible under both sections. (See *People v. Branch* (2001) 91 Cal.App.4th 274, 280-281 (*Branch*).) Here, both the current offense and the prior offenses qualify as "sexual offenses" under Evidence Code section 1108, subdivision (d). We therefore

analyze whether the prior offense testimony was admissible under Evidence Code section 352, to determine whether its admission was error.

Evidence Code "[s]ection 352 provides: 'The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' We review a challenge to a trial court's choice to admit or exclude evidence under section 352 for abuse of discretion. [Citation.] We will reverse only if the court's ruling was 'arbitrary, whimsical, or capricious as a matter of law. [Citation.]' [Citation.]" (*Branch*, *supra*, 91 Cal.App.4th at pp. 281-282.)

Defendant contends the uncharged offenses were dissimilar to the charged crimes and were therefore not sufficiently probative to aid the jury in determining whether defendant committed the charged acts. Although defendant acknowledges the offenses all involved sexual abuse of children, he argues that the present case differs from the others because the abuse took place during the daytime rather than at night and because the victim was not alone with defendant and in his care, but rather in a small apartment where her grandmother was in a room nearby and the doors were open.

In ruling the prior offense testimony admissible, the trial court discussed the similarities between the charged and uncharged offenses: "[T]hese are all minor girls and, essentially, in a position of trust with the defendant. They were essentially alone at the time. It appears that two of these current alleged victims and the C.E. person even appears to be a relative, which is similar to the situation here. So it's not even all with strangers or nonrelatives. [¶] The type of conduct is essentially the same. There may not always be penetration, but it seems to be the same types of acts and the same type of conduct. [¶] . . . [¶] . . . Again, I think they are all very similar. I don't think they are dissimilar at all. [¶] Day versus night, really, that's not what I find most telling. It seems to be the opportunity and the same type of conduct of being alone with a minor. [¶] . . . [¶] . . . Well, [D.D.'s] essentially alone with [defendant]. . . . [All of the victims]

13

are separated from people that are likely to help them. And if [D.D.'s] grandmother was in another place or out of sight, these are the same types of things."

We find no error in the trial court's analysis. The evidence of defendant's prior offenses was highly probative to establish his propensity to commit the crimes and to establish a common scheme or plan with respect to all of his victims. It was also relevant to the determination of both defendant and D.D.'s credibility. Moreover, the trial court did not abuse its discretion in determining that none of the factors the court must consider when deciding whether the probative value of evidence is outweighed by its prejudicial nature militated in favor of defendant.

Whether evidence of uncharged offenses is admitted under Evidence Code sections 1101, subdivision (b), or 1108, in judging its admissibility under Evidence Code section 352, we balance its probative value "against four factors: (1) the inflammatory nature of the uncharged conduct; (2) the possibility of confusion of issues; (3) remoteness in time of the uncharged offenses; and (4) the amount of time involved in introducing and refuting the evidence of uncharged offenses." (*Branch*, *supra*, 91 Cal.App.4th at p. 282.)

The trial court noted the prior offense testimony was inflammatory but found that it was not so inflammatory as to outweigh its probative value because of the high degree of similarity between the cases. Defendant attempts to analogize this case to *People v. Harris* (1998) 60 Cal.App.4th 727 (*Harris*), in which the Court of Appeal reversed the trial court's ruling admitting evidence of a prior offense on the basis that the defendant's prior crimes were "inflammatory *in the extreme*." (*Id*. at p. 738.) As the appellate court described the charged incidents in *Harris*, "at worst defendant licked and fondled an incapacitated woman and a former sexual partner, both of whom were thereafter on speaking terms with him." (*Ibid*.) In the uncharged incident, "[the defendant] entered [the victim's apartment] at night while she was sleeping, beat her unconscious and used a sharp instrument to rip through the muscles from her vagina to her rectum, then stabbed her in the chest with an ice pick, leaving a portion of the pick inside her. Police found her beaten unconscious on the floor, bleeding heavily from the vaginal area and bleeding

from the mouth and nose. Defendant was found hiding nearby with 'blood on his hands, blood on his clothes, blood on his thighs, blood on his penis.' When arrested he had a key ring on a finger and one of the keys fit the victim's apartment door." (*Id*. at p. 733.) In stark contrast to this case, the crimes in *Harris* were markedly dissimilar, and the horrific nature of the prior offense was significantly greater than the crimes charged. This case is more closely analogous to *Branch*, in which the defendant was found guilty of committing a lewd and lascivious act upon a child under the age of 14 and using a foreign object to penetrate the genital opening of a child under the age of 14 who was more than 10 years younger than the perpetrator. (*Branch*, *supra*, 91 Cal.App. at p. 274.) *Branch* held the trial court did not abuse its discretion in admitting testimony the defendant had abused another child victim despite the fact that "[the defendant] engaged in a wider variety of sexual offenses over a longer period of time with [the previous victim, because] the nature of the offenses was very similar . . . ." (*Id*. at p. 283.) Similarly, we hold that the trial court did not abuse its discretion in determining the prior offense testimony was not impermissibly inflammatory here.

Defendant has put forth no evidence to support a finding that the jury was confused with respect to the issues, so that factor also does not weigh in his favor. With respect to remoteness of time, we agree with the trial court that a gap of 12 years is not considerably remote. (See *People v. Ewoldt* (1994) 7 Cal.4th 380, 405; *People v. Ing* (1967) 65 Cal.2d 603, 612.) Finally, the prior offenses testimony comprised only a quarter of the trial transcript in the prosecution's case and was not an undue consumption of time. (See, e.g., *People v. Frazier* (2001) 89 Cal.App.4th 30, 42 [uncharged offense that comprised 27 percent of the total trial transcript did not consume an unreasonable amount of time].) For all of these reasons, we hold the trial court was within its discretion in admitting the prior offenses testimony under Evidence Code sections 1101, subdivision (b), and 1108.

Defendant also contends the CSAAS evidence should not have been admitted because D.D. did not delay in disclosing the incident. The Attorney General argues the evidence was admissible to explain D.D.'s reaction to the molestation as it occurred and

to explain C.E.'s delayed disclosure of her abuse. California courts have long held that expert testimony regarding CSAAS is "admissible solely for the purpose of showing that the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested." (*People v. Bowker* (1988) 203 Cal.App.3d 385, 394 (*Bowker*), italics omitted.)

Such evidence is routinely presented to rebut the myths that a child would immediately disclose abuse and would not recant his or her story after disclosure, and to rehabilitate a child victim when their behavior contradicts normal expectations. (*Bowker, supra*, 203 Cal.App.3d at pp. 394-395.) We need not address whether the reasons proffered by the Attorney General are permissible bases for the introduction of CSAAS evidence, because any error in the admission of such expert testimony was harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836; *Bowker*, *supra*, at p. 395 [court's failure to limit expert's CSAAS testimony was harmless error].) The evidence of defendant's guilt was overwhelming. D.D. testified defendant molested her and described the abuse in detail. Although defendant denied that anything inappropriate had occurred, the events and circumstances she described were incredibly similar to those in all three prior offenses in which defendant also denied wrongdoing. Given the evidence, "[w]e cannot conclude . . . it is reasonably probable a verdict more favorable to [defendant] would have resulted" had the trial court limited Dr. Bernfield's testimony. (*Bowker*, *supra*, at p. 395.)

Defendant additionally argues that the jail calls should not have been admitted because they only went to the likelihood that C.E. had also been abused. However, defendant specifically does not assert that admission of the jail calls constitutes a separate ground for reversal. Accordingly, defendant has waived the argument on appeal, as the Attorney General contends. Regardless, even if the admission of the jail calls was error, it was harmless for the reasons discussed above.

Finally, defendant asserts Evidence Code section 1108 inherently denies due process of law and a fair trial and violates his equal protection rights under the Constitution. We are bound by our Supreme Court's rulings on these issues and therefore reject his arguments. (*Falsetta*, *supra*, 21 Cal.4th at pp. 915, 918 [rejecting due process

16

challenge to Evidence Code section 1108 and noting with approval rejection of equal protection challenge in *People v. Fitch* (1997) 55 Cal.App.4th 172, 184-185]; *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

**Stay of Sentence in Count 2**

Defendant contends, and the Attorney General concedes, that count 1, oral copulation/sexual penetration with a child under 10 years old (§ 288.7, subd. (b)), and count 2, a lewd act upon a child (§ 288, subd. (a)), involve the same course of conduct against the same victim. Section 654 bars double punishment, including concurrent sentences, for a course of conduct constituting one indivisible transaction with one criminal objective. (*People v. Latimer* (1993) 5 Cal.4th 1203, 1216-1217; *Neal v. State of California* (1960) 55 Cal.2d 11, 19, disapproved on other grounds in *People v. Correa* (2012) 54 Cal.4th 331, 344.) Thus, the imposition of sentence on count 1 requires that the sentence on count 2 be stayed. (E.g., *People v. Deloza* (1998) 18 Cal.4th 585, 591-592.)

We accept the Attorney General's concession and modify the judgment to stay imposition of sentence on count 2 pursuant to section 654.

## DISPOSITION

The judgment is modified to stay the sentence on count 2 pursuant to section 654. The clerk of the court is directed to prepare an amended abstract of judgment and to forward a certified copy to the Department of Corrections and Rehabilitation. As so modified, the judgment is affirmed.

17

KRIEGLER, J.

We concur:

TURNER, P. J.

ARMSTRONG, J.