Filed 11/25/13  P. v. Luna CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E055641 |
| v. | (Super.Ct.No. SWF029715) |
| LUIS LUNA, JR., | O P I N I O N |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Michael B. Donner, Judge.  Affirmed.

Mark Yanis, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Barry Carlton and Heather M. Clark, Deputy Attorneys General, for Plaintiff and Respondent.

1

## I. INTRODUCTION

Defendant Luis Luna, Jr. was sentenced to 12 years in prison after a jury found him guilty as charged of violating Penal Code section 288.5, continuous sexual abuse of a child under the age of 14 years. The victim, defendant's daughter Doe, testified the abuse occurred while she was between the ages of 11 and 14 while she and defendant lived in the same home.

Doe did not disclose the sexual abuse to anyone until she was nearly 15 years old, and when she did she was initially unclear about exactly when and how often the abuse occurred. In order to dispel any misconception the jurors may have had that Doe's delayed disclosure and other conduct following the alleged molestation was inconsistent with the conduct of a child molestation victim, the prosecution presented expert testimony on Child Sexual Abuse Accommodation Syndrome (CSAAS).

On this appeal, defendant raises two claims concerning the CSAAS testimony: (1) the jury was erroneously instructed pursuant to the standard form language of CALCRIM No. 1193 that it could consider the expert testimony on CSAAS "in evaluating the believability of [Doe's] testimony"; and (2) expert testimony on CSAAS should be inadmissible per se in California because it violates a defendant's due process rights. We reject these claims and affirm the judgment.

## II.  BACKGROUND

A.  *Doe's Trial Testimony*

Doe testified that defendant began sexually molesting her when she was 11 years old and had sexual intercourse with her at least once each month while she was between the ages of 11 and 14.  The abuse occurred while Doe lived in a house in Hemet with defendant, her mother, and her two younger brothers.  Doe was 17 years old when she testified at trial.

Doe lived with defendant, her mother, and her two younger brothers.  Doe's mother did not work and was diagnosed with bipolar disorder and obsessive compulsive disorder.  One of Doe's brothers has cerebral palsy and the other has speech problems.  When she was in grade school, Doe was diagnosed with attention deficit/hyperactivity disorder, dyslexia, and bipolar disorder.

When Doe was around seven years old, she and her mother moved out of the house, but moved back in when Doe was 11 years old.  After Doe and her mother returned to the house, defendant slept in the master bedroom, Doe's mother slept in the dining room, Doe had her own bedroom, and Doe's two younger brothers shared a bedroom.  There were two other bedrooms; one was used as a computer room and the other had a waterbed.

At trial, Doe recalled that defendant first touched her sexually during the summer when she was 11 years old and "going into the fifth grade."  They were in the master bedroom when Doe was explaining something that had happened to her.  Defendant told Doe

to show him what had happened, so Doe lay down on the floor with her clothes on to show him. While she was on the floor, defendant rubbed his penis against Doe's vagina while he was wearing only his underwear and a shirt. It happened quickly. Afterward, defendant got up and went to his bed and Doe walked out of the room. Doe did not tell anyone about the incident because she was confused.

Thereafter, defendant subjected Doe to various sex acts in the master bedroom, in Doe's bedroom, in the computer room, and in the waterbed room. He fondled Doe's breasts on more than one occasion and once "use[d] his mouth" on her "private" in her bedroom. The first time defendant had sexual intercourse with Doe they were in the master bedroom. He told her to lay down in a sexual position, asked her whether she wanted to have sex with him, and she agreed. This was the first time Doe had ever had intercourse and it was painful.

Defendant had intercourse with Doe at least once every month for the next three years and while Doe was in the fifth, sixth, seventh, and eighth grades. The intercourse occurred in Doe's bedroom, in the bedroom with the waterbed, and most often in the master bedroom with the door locked. On one occasion Doe's mother came into the master bedroom right after defendant had intercourse with Doe. Doe recalled that the door to the bedroom was locked, but the lock "wasn't that steady." Doe was naked but was covered with a sheet and was next to the other bed in the room. Defendant was on the bed, naked underneath the covers. Doe's mother asked what they were doing in the room with the door locked, and Doe just pushed her out, put her clothes on, and went back to her room.

4

After the sexual abuse had been going on for approximately two years, Doe began asking defendant for things in exchange for sex. When she was around 13 years old, Doe asked defendant if, in exchange for sex, he would give her some of the liquor from the closet in the master bedroom. He agreed and she drank some of the liquor after they had sex. Defendant also bought Doe clothes and inexpensive jewelry in exchange for her having sex with him.

Defendant did not use physical force to abuse Doe, and Doe did not try to make him stop because she was "really confused" and did not know whether the abuse was right or wrong while it was occurring. Defendant told Doe to keep the abuse a secret; that it was "private" and not to tell anyone about it; he would go to jail if she told anyone; and if she became pregnant by him she should say another man was the father. To avoid getting Doe pregnant, defendant had Doe shower and clean her "private" after he had intercourse with her.

Doe did not tell anyone about the abuse during the time she lived in the house. The abuse finally stopped after Doe and her mother moved out of the house when Doe was in the eighth grade. The first person she told about the abuse was her best friend's mother, Leticia Hefele.

When Doe was in ninth grade, she and her mother went back to visit her brothers and defendant. Defendant cried and asked Doe to forgive him because he did not know what he was doing or why he did it. Doe told him that she forgave him. When asked how she felt about defendant, Doe testified she felt "sad" about being sexually abused,

5

but she was not angry and she did not want defendant to go to jail. She loved defendant and had good memories of the time she spent with him when she was younger, before the abuse began.

B. *Leticia Hefele's Testimony*

Hefele testified she first knew Doe when Doe and Hefele's daughter were in the fourth grade and played together. When the two girls were around 12 years old, Doe began spending more time with Hefele's family. Hefele saw that Doe was sad and cried at times, and she believed Doe did not have a stable home environment. Doe would tell Hefele she was happy to be with Hefele's family, and Hefele treated Doe as a daughter.

In August 2009, shortly before Doe turned age 15, Doe appeared to be very upset, so Hefele confronted her and asked her whether anything was wrong. Doe broke down crying and said her father had been having sex with her. Hefele, herself a victim of molestation as a child, had suspected Doe was being sexually abused because she had seen Doe apparently feeling and behaving in ways similar to the ways she felt and acted when she was being molested. Hefele called child protective services and "they came over right away."

C. *Doe's Interviews and Pretext Meeting with Defendant*

Shortly after Hefele called child protective services, a police detective arranged for Doe to have a forensic interview with social worker Christine Brown. The forensic interview began on August 31, 2009, but was stopped because Doe was tired, frustrated, and was

6

withdrawing from the interview. Doe was taking Abilify at the time and was hungry, nauseous, tired, and dizzy. The forensic interview concluded on September 22, 2009.

When Doe spoke to the police detective before the forensic interview, she did not disclose everything defendant had done. She testified that she only told part of the truth at first because she felt uncomfortable talking to the police. In contrast to her trial testimony, she told the police there had been no genital penetration, and according to the police detective she appeared confused concerning when and over what period of time the abuse had occurred. Her answers became clearer during the second part of her forensic interview, however.

The police detective also arranged for Doe to have a "pretext meeting" with defendant in order to elicit information about the abuse. During the pretext meeting, Doe reminded defendant of the times he had sex with her and told him she thought he needed counseling. In response, defendant said something to the effect that it was something that never happened or something he couldn't talk about.

D. *Dr. Ward's Testimony on CSAAS*

Clinical and forensic psychologist Dr. Jody Ward testified as an expert witness for the prosecution on CSAAS. CSAAS is a syndrome or "pattern of behaviors" that helps explain why child victims of sexual abuse "do what they do." CSAAS helps explain the perceived inconsistency between how an adult might believe an abused child would behave versus how the child may actually behave. For example, an adult may believe

7

abused children would fight back or protect themselves from abuse, or would promptly report the abuse, but the syndrome explains why children may not take these actions.

CSAAS has five components: secrecy, helplessness, entrapment and accommodation, delayed disclosure, and retraction or recantation. The first component, secrecy, refers to the fact that sexual abuse often occurs in private, and this conveys an unspoken message to the child that it should be kept secret. Some children are told to keep the abuse a secret and do not need to be threatened in order to keep the abuse a secret. Helplessness, the second component, also explains why children tend to keep the abuse a secret. Children are dependent on adults for their physical and emotional needs, and they do not have any avenues at their disposal to improve their situation. They are also taught to obey adults and do what they are told. They are reluctant to disclose the abuse because they do not know what will happen if they do.

The third component, entrapment and accommodation, holds that child sexual abuse victims feel trapped because they are dependent on the adult and they have to learn to accommodate the abuse in some way. It is consistent with the syndrome for a child to try to obtain benefits, gifts, or rewards in exchange for accommodating the sex acts. To adults, it doesn't make sense that a child would continue to subject themselves to continuing abuse, but the child's feelings of helplessness and entrapment explain why they find ways to accommodate the abuse. The child may also believe the abuse is a necessary evil they have to put up with or accommodate in order to keep the positive aspects of the relationship. The fourth component, "delayed, unconvincing disclosure,"

8

explains it is not uncommon for a child to delay reporting for years, and when a child does make a disclosure of sexual abuse, it is usually not complete at the beginning.

The fifth component, retraction or recantation, occurs least often of the five components, but occurs when a child who discloses abuse faces negative repercussions such as the family splitting up or the child being taken out of the family home. The child later recants or denies the abuse occurred in order to restore the status quo of the family, because the child feels guilty for breaking up their family and does not want the perpetrator to go to jail.

Dr. Ward had never met Doe, was not familiar with the allegations against defendant, and did not offer any opinion that Doe was credible or that her trial testimony was believable. Under cross-examination, Dr. Ward explained that if a child has a developmental disability, the child would probably feel more helpless and dependent upon the adults around him or her and less likely to take action on his or her own behalf in a sexually abusive situation.

E. *The Defense Claim That Doe Was Not Credible*

The defense emphasized that Doe was not credible and implied her testimony accusing defendant was due to her feeling poor and depressed, having a cognitive disorder, fighting with her mother, and wanting money, clothes, jewelry, and other material things.

III.  DISCUSSION

A.  *CALCRIM No. 1193 is Not Contrary to Law Limiting the Admissibility of CSAAS Evidence*

The jury was instructed pursuant to CALCRIM No. 1193 as follows:  "You have heard testimony from Dr. Jody Ward regarding [CSAAS].  [¶]  Dr. Ward's testimony about [CSAAS] is not evidence that the defendant committed any of the crimes charged against him.  [¶]  You may consider this evidence only in deciding whether or not [Doe's] conduct was not inconsistent with the conduct of someone who has been molested, *and in evaluating the believability of her testimony*."  (Italics added.)  The final italicized clause of the instruction is part of the standard language of CALCRIM No. 1193.

Defendant claims the italicized clause of CALCRIM No. 1193 impermissibly allowed the jury to use the expert testimony on CSAAS to determine whether Doe's molestation claims were true.  More broadly, he argues the italicized clause is contrary to settled law prohibiting the use of CSAAS evidence as evidence that the alleged victim's molestation claims are true.  For the reasons we explain, it is not reasonably likely the jury applied the instruction in the impermissible manner defendant claims.

It has long been settled law in California that CSAAS testimony is admissible only for the limited purpose of disabusing the jury of any misconceptions it may hold concerning how child molestation victims commonly react or should react to being molested.  (*People v. Patino* (1994) 26 Cal.App.4th 1737, 1744; *People v. Bowker* (1988) 203 Cal.App.3d 385, 394.)  "'Such expert testimony is needed to disabuse jurors of

10

commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior. . . .' [Citation.]" (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1301.) "CSAAS *assumes* a molestation has occurred and seeks to describe and explain common reactions of children to the experience. [Citation.]" (*People v. Bowker, supra,* at p. 394.)

Accordingly, CSAAS evidence "'"is admissible to rehabilitate [the molestation victim's] credibility when the defendant suggests that the child's conduct after the incident . . . is inconsistent with [the child's] testimony claiming molestation. [Citations.]"' [Citations.]" (*People v. Perez* (2010) 182 Cal.App.4th 231, 245, quoting *People v. McAlpin, supra,* 53 Cal.3d at p. 1300; see also *People v. Brown* (2004) 33 Cal.4th 892, 906.) By contrast, CSAAS evidence may not be used to show that the molestation occurred or that the alleged victim's molestation claims are true. (*People v. Housley* (1992) 6 Cal.App.4th 947, 957; *People v. Bowker, supra,* 203 Cal.App.3d at p. 394.)

Defendant argues the italicized clause of CALCRIM No. 1193 which permits the jury to use CSAAS evidence in evaluating the complaining witness's credibility is contrary to "the settled law regarding the relevance and use of CSAAS testimony." He argues that this part of the instruction is "the same as telling the jury to use the [CSAAS] evidence to determine whether [the victim's] molestation claim is true." Not so.

In addressing a claim of jury misinstruction, we assess the instructions as a whole and view the challenged instruction in context with other instructions to determine

11

whether there was a reasonable likelihood the jury applied the challenged instruction in an impermissible manner. (*People v. Jennings* (2010) 50 Cal.4th 616, 677.) We also presume that the jury followed the court's instructions. (*People v. Edwards* (2013) 57 Cal.4th 658, 746.) In light of CALCRIM No. 1193 in its entirety and other instructions, it is not reasonably likely the jury understood CALCRIM No. 1193 as allowing it to use the CSAAS evidence in determining that the molestation occurred or that Doe's molestation claims were true.

The jury was initially instructed to "[p]ay careful attention to all of [the] instructions and consider them together" (CALCRIM No. 200), and that "certain evidence was admitted for a limited purpose" and to "consider that evidence only for that purpose and for no other" (CALCRIM No. 303). CALCRIM No. 1193 then told the jury that the CSAAS evidence was *not* evidence that defendant molested Doe, and to use the CSAAS evidence "only" for the limited purpose of determining whether Doe's conduct was inconsistent with the conduct of a child who had been molested "*and in evaluating the believability of her testimony*" that the molestations occurred. (Italics and underlining added.)

Reading all of these instructions together, and each in light of the others, it is unlikely the jury interpreted the final, italicized "and" clause of CALCRIM No. 1193 as allowing it to use the CSAAS evidence in determining that the molestations occurred or that Doe's claims were true per se. Rather, it is likely the jury understood CALCRIM No. 1193 as allowing it to use the CSAAS evidence in evaluating the believability of Doe's testimony that the molestation occurred, *in light of the evidence that Doe engaged in conduct seemingly*

*inconsistent with the conduct of a child who had been molested* after the molestations occurred.

There is distinction between using CSAAS evidence for the impermissible purpose of inferring a child's molestation claims are true—which the first clause of CALCRIM No. 1193 expressly prohibits—and using CSAAS evidence for the permissible purpose of evaluating the *believability of the child's trial testimony* that the molestations occurred *in light of* evidence that the child engaged in conduct seemingly inconsistent with the child's molestation claims, after the molestations allegedly occurred.  As stated in *People v. McAlpin, supra,* 53 Cal.3d at page 1300:  Expert testimony on CSAAS "*is admissible to rehabilitate* [*the child*] *witness's credibility* when the defendant suggests that the child's conduct after the incident . . . is inconsistent with his or her testimony claiming molestation." (Italics added.)  CALCRIM No. 1193 and the other instructions limited the jury's consideration of the CSAAS to its permissible purpose.

In sum, in view of the instructions as a whole, it is not reasonably likely the jury understood CALCRIM No. 1193 as allowing it to use the CSAAS evidence for the impermissible purpose of determining the molestations occurred or that Doe's molestation claims were true.  Rather, the jury likely understood the instruction as permitting it to use the CSAAS evidence solely for the distinct and permissible purpose of evaluating Doe's credibility as a witness in light of the evidence that her conduct following the alleged molestations was seemingly inconsistent with the conduct of a child who had been molested.

B.  *CSAAS Testimony Does Not Violate a Defendant's Due Process Rights*

Defendant further claims that expert testimony on CSAAS should be inadmissible per se in California because it violates the due process rights of a defendant accused of child molestation.  He relies on several out-of-state cases limiting or prohibiting the use of CSAAS evidence,[1] and argues that CSAAS is too generic to aid the trier of fact; it is not scientific; its concepts are not sufficiently beyond the common experience of jurors to be of assistance; and it impermissibly bolsters the credibility of the victim.

As the People point out, the California Supreme Court has effectively acknowledged that CSAAS evidence is admissible.  (*People v. Brown, supra,* 33 Cal.4th at p. 906; *People v. McAlpin, supra,* 53 Cal.3d at pp. 1300-1301.)  In addition, the United States Supreme Court has held that the admission of relevant "battered child syndrome" evidence does not violate the due process clause of the Fourteenth Amendment (*Estelle v. McGuire* (1991) 502 U.S. 62, 69-70), and battered child syndrome evidence is analogous to CSAAS evidence (*People*

---

[1] Defendant relies on the following out-of-state decisions limiting or prohibiting the admissibility of CSAAS evidence:  *State v. Stribley* (Iowa Ct.App. 1995) 532 N.W.2d 170; *Commonwealth v. Dunkle* (1992) 529 Pa. 168 [602 A.2d 830]; *Bussey v. Commonwealth* (Ky. 1985) 697 S.W.2d 139; *Hester v. Commonwealth* (Ky. 1987) 734 S.W.2d 457; *Mitchell v. Commonwealth* (Ky. 1989) 777 S.W.2d 930; *Newkirk v. Commonwealth* (Ky. 1997) 937 S.W.2d 690; *State v. Ballard* (Tenn. 1993) 855 S.W.2d 557; *State v. Bolin* (Tenn. 1996) 922 S.W.2d 870.  As the People point out, however, courts in other states have held CSAAS-type evidence admissible.  (See, e.g., *State v. Batangan* (1990) 71 Haw. 552, 556-558 [799 P .2d 48, 51-52]; *In re Nicole V.* (1987) 71 N.Y.2d 112, 120-121 [518 N.E.2d 914, 917-918]; *State v. Lindsey* (1986) 149 Ariz. 472, 473-474 [720 P.2d 73, 74-75]; *Allison v. State* (1986) 179 Ga.App. 303, 307-309 [346 S.E.2d 380, 384-385]; *State v. Brotherton* (Iowa 1986) 384 N.W.2d 375, 378; *State v. Pettit* (1984) 66 Ore.App. 575, 579 [675 P.2d 183, 185]; *State v. Myers* (Minn. 1984) 359 N.W.2d 604, 609-610; *Smith v. State* (1984) 100 Nev. 570, 571-572 [688 P.2d 326, 327].)

*v. Patino, supra,* 26 Cal.App.4th at p. 1747, citing *People v. Bowker, supra,* 203 Cal.App.3d at pp. 393-394). "For this reason, there can be little doubt the due process dimensions of both types of evidence is similar if not identical. Therefore, introduction of CSAAS testimony does not by itself deny [a defendant] due process." (*People v. Patino, supra,* at p. 1747.)

## IV. DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

KING _____
                                                           J.

We concur:

HOLLENHORST _____
                       Acting P. J.

MILLER _____
                     J.