Filed 1/5/22  P. v. Deneef CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>STEVEN JAMES DENEEF,<br><br>    Defendant and Appellant. | D077979<br><br><br><br>(Super. Ct. No. SCN386272) |

APPEAL from a judgment of the Superior Court of San Diego County, Carlos O. Armour, Judge.  Affirmed as modified.

Susan K. Shaler, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina, Melissa Mandel, and Amanda E. Casillas, Deputy Attorneys General, for Plaintiff and Respondent.

Steven James Deneef forced six-year-old Savanna R. to orally copulate him, touched her genital area, and showed her pornography. Deneef appeals his convictions on various sex offenses, arguing expert testimony related to the "child sexual abuse accommodation syndrome" (CSAAS) is categorically inadmissible and claiming the related jury instruction (CALCRIM No. 1193) impermissibly lessened the prosecution's burden of proof. But guiding precedent compels the conclusion that appropriately tailored evidence is admissible for the limited purpose of disabusing jurors of misconceptions or myths that might affect their assessment of a complaining witness's credibility. Once such evidence is properly admitted, CALCRIM No. 1193 accurately instructs how to use it for that limited purpose. We accept Deneef's final claim that his $154 criminal justice administration fee must be vacated pursuant to recent legislation and as so modified, affirm.

FACTUAL AND PROCEDURAL BACKGROUND[1]

Deneef married Heidi in 2014 and was a father figure to her young daughter, Savanna. Intermittently incarcerated and coping with a substance abuse problem, Deneef's and Heidi's relationship became "chaos" by September 2017. Heidi filed for divorce that month and obtained a restraining order after a domestic violence incident that Savanna witnessed. That was the last time either she or Savanna saw Deneef in person.

Within a month, Savanna began exhibiting behavioral difficulties. She would clench her fists and tell her mother, "I can't get what Daddy did out of my brain," which Heidi took to mean the domestic violence incident. Savanna's first-grade teacher grew concerned with her behavior and referred her to a school social worker. Savanna told the social worker in March 2018

---

[1] Because Deneef's claims on appeal largely pertain to the admission of expert testimony related to CSAAS and the court's resulting jury instruction, we keep the remaining background discussion brief.

2

that her dad used to do bad things to her and made her touch him and lick his private part, prompting a report to Child Protective Services (CPS). Savanna also told her grandfather (Heidi's father) on two occasions that spring that Deneef walked around naked and made her touch and lick his "u-haul," which was what she called female and male genitalia.

During a forensic interview with a CPS investigator in late March 2018, Savanna disclosed that Deneef filmed her while she was bathing and used his fingers to tickle her u-haul.[2] She also described an incident in which Deneef called her into his bedroom; when she entered, he was naked and touching his u-haul. He showed Savannah pornographic videos of him and Heidi, put lotion on his u-haul so Savannah would not taste the "germs," and forced her to touch and lick his u-haul.[3] The CPS investigator contacted Detective Sean Snow at the San Diego County Sheriff's Department.

Savanna was interviewed by a forensic social worker in early April. Describing the oral copulation, she again stated that Deneef showed her sexual videos on his phone and made her lick his u-haul, but added that he first made her fondle his penis and communicated that the oral sex felt "so good" while looking at his phone. Savanna described a separate incident in which Deneef "pulled" her u-haul with his fingers "gently," so as not to "rip it," while saying "ooh." When asked to describe Deneef's penis, Savanna said it was tattooed with fancy writing. Heidi explained that Deneef had a penile tattoo that read, "Property of Naomi" (his ex-wife) and could only be seen when his penis was erect; she said there was no reason for Savanna to know about it.

---

[2]     This evidence related to count 3.

[3]     This evidence related to counts 1 and 2.

The San Diego County District Attorney charged Deneef with orally copulating a child 10 or under (Pen. Code, § 288.7, subd. (b), count 1),[4] committing a forcible lewd act through the same conduct (§ 288, subd. (b)(1), count 2), committing a forcible lewd act by touching Savanna's genital area (§ 288, subd. (b)(1), count 3), and showing her harmful matter (§ 288.2, subd. (a), count 4). All four counts were said to have occurred between August 1 and September 22, 2017 (as Savanna was starting first grade). As to counts 2 and 3, it was alleged that Deneef engaged in substantial sexual conduct within the meaning of section 1203.066, subdivision (a)(8), rendering him ineligible for probation. As to each count, the information specified that Deneef had two prior serious felony convictions (§§ 667, subd. (a)(1), 1192.7, subd. (c)), each of which constituted a prior strike.[5] (§§ 667, subds. (b)−(i), 1170.12.)

Deneef's first jury trial ended in a mistrial.[6] A second commenced in February 2020 and involved substantially the same witnesses. Eight years old at the time of the second trial, Savanna testified that Deneef once urinated on her while they showered together, but could not recall any other touching. The People accordingly relied on Savanna's prior statements to prove their case. Detective Snow testified that Savanna's disclosures had changed over time, with her previously testifying at age seven (during the first trial) that Deneef had forced her to suck his u-haul. Savanna's current

---

[4]    Further undesignated statutory references are to the Penal Code.

[5]    Deneef waived his right to a jury trial on his priors.

[6]    The jury foreman indicated in a note that jurors were evenly split on count 1, split 9–3 on counts 2 and 3, and split 7–5 on count 4.

testimony seemed "much more hesitant" by comparison, and she looked over at Deneef before answering questions.

Christina Shultz, a forensic interviewer at Palomar Health Forensic Services, testified for the prosecution about misconceptions regarding child molestation victims.[7] Because the person who conducted Savanna's forensic interview at that facility had since retired, Shultz provided a general description of the interview process at Palomar Health. Disclaiming any familiarity with the facts, Shultz then spoke in general terms "about some misconceptions that occur in child sexual abuse." This evidence covered three broad categories—why child victims may delay reporting, what disclosure looks like when it happens, and what causes victims to submit to abuse or maintain ties with their abusers.

First, Shultz explained that only a third of child sexual molestation victims actually report their abuse during childhood, and those that do often delay. She explained that a child's close relationship with the abuser can

---

[7]    Before trial commenced, the prosecution filed a motion in limine to admit CSAAS-related testimony. Explaining that Savanna's credibility would be at issue, it argued that "general expert testimony about victims as a class" would disabuse the jury of any notions that the abuse did not occur given Savanna's delayed reporting and incomplete disclosures, her apparent lack of fear or trauma in describing events, her inability to recall specific dates and times of the abuse, her continued affection toward Deneef, and the lack of physical force, weapons, or threats of violence used to coerce compliance. In addition to these specific topics, the prosecution sought to dispel any notion that molestation did not occur because Savanna "knew her abuser, and this was not a case of 'stranger danger.'" Deneef filed a motion in limine seeking to exclude expert testimony altogether, or at minimum, requesting an Evidence Code section 402 hearing before the expert testified. Granting the prosecution's motion, the court ruled that Shultz could explain the behaviors of victims as a class as she did in the first trial, subject to Deneef's ability to renew his motion or object when the evidence came in. There were no objections during Shultz's direct testimony.

5

lead to delay. Children who experience otherwise positive relationships with their abuser may feel guilty reporting or fear negative consequences to the abuser or other family members. Disclosure may be triggered by different things—older children who begin dating may say they cannot take the abuse anymore. Other children may disclose as they better understand that what happened was abuse, or when the offender no longer has access to them.

Next, Shultz explored what disclosures look like when they happen. A young child might accidentally disclose, blurting out details without comprehending that it was abuse. But when a child intentionally decides to report, it is not uncommon for them to make partial or incremental disclosures to gauge how an adult will react. Shultz described disclosure as a *process* rather than a single event. She explained that children may also change how they report details over time. When young, they may report events matter-of-factly, without appearing outwardly traumatized, but as they get older and understand the abuse and potential consequences, they may appear tearful. Shame and embarrassment make it particularly difficult for children to discuss genital or oral contact and touching, especially as they get older and better understand what occurred.

Finally, Shultz spent some time discussing why molestation victims comply with abuse, fail to fight back, or maintain close bonds with their abusers. She explained that victims do not dislike everything about their abusers and can compartmentalize the trauma. Coercion is induced not by physical force or weapons, but instead by a grooming process by which an abuser builds trust and gains access to a child. A victim may feel compelled to keep silent even if the abuser does not expressly demand it.

The defense cross-examined Shultz only briefly. Deneef's counsel sought to establish that *anyone* could fit the description of a child molestation

6

victim given that disclosure could be delayed *or* immediate; incremental *or* complete. Likewise, counsel elicited testimony bearing on Savanna's apparent memory lapses during trial, with Shultz explaining that a victim is more likely to remember core instead of periphery details.[8]

Outside the jury's presence, the court expressed its intent to instruct the jury with CALCRIM No. 1193; defense counsel replied, "No objection." The jury was thus instructed:

> "You have heard testimony from Christina Shultz regarding child sexual abuse. Christina Shultz's testimony of child sexual abuse is not evidence that Defendant committed any of the crimes charged against him. You may consider this evidence only in deciding whether or not Savanna's conduct was not inconsistent with the conduct of someone who has been molested and in evaluating the believability of her testimony."

In her closing argument, the prosecutor urged the jury to think about who had a motive to lie versus to tell the truth, and to consider what children lie *about*. She noted that Deneef's penile tattoo was visible only when his penis was erect, and Savanna knew something she had no reason to know. Although the jury could not use Shultz's testimony to decide guilt, the prosecutor stated it could use this evidence to evaluate Savanna's credibility. As Shultz explained, child victims maintain ties with their abusers, disclose when the abuser is no longer around, and may not disclose details all at once. Victims also find it harder to discuss details of certain acts, such as oral

---

[8] Deneef's defense was that the molestation never occurred. During his case-in-chief, he took the stand, admitting to being "basically a career criminal" but denying ever molesting a child. He suggested Savanna might have seen his erect penis when walking in on him in his bedroom or while he was urinating, and that she might have seen pornography on Heidi's phone. A defense expert testified that Deneef's test scores did not suggest a predilection for molesting children. A former employer and a girlfriend of Deneef's both spoke to his good character.

copulation and genital touching, as they get older.[9]  Arguing Savanna had nothing to gain and no reason to lie, the prosecutor urged the jury to convict.

The jury convicted Deneef as charged and found the allegations of substantial sexual contact in counts 2 and 3 true.  In a bifurcated proceeding, Deneef admitted two prior strike and serious felony convictions.  At sentencing, the court imposed a total indeterminate term of 75 years to life, calculated as follows:  On count 1, it sentenced Deneef to 15 years to life under section 288.7, subdivision (b), tripled for the strikes under section 667, subdivision (e)(2)(A).  On counts 2 and 3, it imposed a 10-year upper term under section 288, subdivision (b)(1), tripled for the strikes and converted to life terms under section 667, subdivision (e)(2)(A).  The court stayed imposition of the sentence on count 2, as well as the 5-year serious felony enhancement attached to that count, because it rested on the same conduct underlying count 1.  It ran the indeterminate terms on counts 1 and 3 consecutively.  In addition, the court imposed a 16-year determinate sentence, consisting of the 5-year serious felony enhancements attached to counts 1 and 3 (§ 667, subd. (a)), and a 6-year upper term on count 4 (consisting of the 3-year upper term under section 288.2, subdivision (a)(2)), doubled for the prior strikes under section 667, subdivisions (e)(1) and (e)(2)(C).  Among other fines and fees, the court imposed a $154 criminal justice administration fee pursuant to former Government Code section 29550.

---

[9]     Aspects of the prosecutor's closing argument went farther, recounting Shultz's testimony "about how abusers groom kids" and suggesting "that happens to be exactly what Savanna said happened."  Deneef did not object and does not argue prosecutorial misconduct on appeal.  Instead, he suggests the prosecutor's closing argument demonstrated *prejudice* from the erroneous admission of Shultz's testimony.

DISCUSSION

Deneef contends that expert testimony related to CSAAS is categorically inadmissible because it invades the province of the jury to decide witness credibility. In a connected argument, he claims instructional error occurred when the jury was given CALCRIM No. 1193 to construe that expert testimony. We reject both assertions, but agree with Deneef that recent legislative amendments require that his $154 criminal justice administration fee be vacated.

A.    *Conditional on a Proper Foundation, CSAAS-Related Evidence May Be Admitted for a Limited Purpose.*

Deneef makes clear that he does not challenge the trial court's admission of particular expert testimony by Christina Shultz, but rather seeks "the exclusion of CSAAS evidence as a category" and believes "CSAAS evidence should not be admitted under any set of circumstances." As Deneef suggests, this claim presents a question of law and fails under guiding precedent.

More than thirty years ago, this court confronted the admissibility of "child sexual assault accommodation syndrome" evidence in *People v. Bowker* (1988) 203 Cal.App.3d 385 (*Bowker*). Over defense objection at trial, the prosecution had examined a psychologist who described in detail five stages of a "syndrome" common in child molestation cases—secrecy, helplessness, entrapment and accommodation, delayed disclosure, and retraction. The expert opined that molestation victims might question whether they would be believed if they reported, and that it was common for victims to make inconsistent reports. (*Id.* at pp. 389–390.) Defendant claimed evidentiary error on appeal.

To evaluate his claim, we reviewed *People v. Bledsoe* (1984) 36 Cal.3d 236 (*Bledsoe*), which addressed the admissibility of expert testimony

9

regarding trauma reactions that are common among rape victims. *Bledsoe* held such testimony was inadmissible to prove that rape had, in fact, occurred. (*Id.* at p. 251.) Unlike fingerprints or blood tests, the rape-trauma syndrome was designed not as an investigatory or diagnostic tool, but rather as a *therapeutic* device to identify, predict, and treat emotional problems experienced by rape counselors' clients or patients. (*Id.* at pp. 249–250.) Nevertheless, the court reasoned that related evidence might be relevant to disabuse "the jury of some widely held misconceptions about rape and rape victims, so that it may evaluate the evidence free of the constraints of popular myths." (*Id.* at pp. 247–248.)

We construed *Bledsoe* "to reject the use of CSAAS evidence as a *predictor* of child abuse." (*Bowker, supra,* 203 Cal.App.3d at p. 393.) Not only did this bar an expert from applying CSAAS theories to conclude the victim was molested, but it also prohibited " 'general' testimony describing the components of the syndrome in such a way as to allow the jury to apply the syndrome to the facts of the case and conclude the child was sexually abused." (*Ibid.*) We explained that the latter might present a particular danger, with jurors unaware that attributes common among molestation victims are "also found in significant numbers of children who have not been molested." (*Ibid.*) It was thus error for the psychologist to describe CSAAS components in a way that "constructed a 'scientific' framework into which the jury could pigeonhole[ ] the facts of the case." (*Id.* at p. 395; see also *People v. Clotfelter* (2021) 65 Cal.App.5th 30, 64 (*Clotfelter*) [prosecutor's use of expert testimony invited an impermissible leap that the children were victims of the charged crimes].)

Yet we did not hold that any evidence related to CSAAS was categorically inadmissible. Instead, consistent with the Supreme Court's

10

analysis in *Bledsoe*, we permitted admission for the *limited* purpose of demonstrating that reactions by the complaining witness "are not inconsistent with having been molested." (*Bowker, supra,* 203 Cal.App.3d at p. 394.) We explained that the People bore the burden to identify a specific myth or misconception actually suggested by the evidence that the proffered expert testimony was designed to rebut. (*Id.* at pp. 393–394.)[10] "For instance, where a child delays a significant period of time before reporting an incident or pattern of abuse, an expert could testify that such delayed reporting is not inconsistent with the secretive environment often created by an abuser who occupies a position of trust. Where an alleged victim recants his story in whole or in part, a psychologist could testify on the basis of past research that such behavior is not an uncommon response for an abused child who is seeking to remove himself or herself from the pressure created by police investigations and subsequent court proceedings." (*Bowker,* at p. 394.) Profile evidence describing the behaviors of a typical child *molester* falls

---

[10]   Consistent with the suggestion in *Bowker* (203 Cal.App.3d at pp. 393–394 & fn. 9), later authorities have held that with an appropriate foundation expert testimony concerning CSAAS may be presented in the prosecution's case-in-chief rather than in rebuttal. (*People v. Patino* (1994) 26 Cal.App.4th 1737, 1745; see also *People v. Housley* (1992) 6 Cal.App.4th 947, 956.)

outside this admissibility framework.[11]  And where a case presents no danger of jury confusion, "there is simply no need for the expert testimony." (*Bowker,* at p. 394; see *Clotfelter, supra,* 65 Cal.App.5th at pp. 64−65 [CSAAS-related testimony inadmissible as to prior sex crimes for which victims did not delay reporting or recant, and defendant did not question victim credibility].)

The California Supreme Court approved our approach in *People v. McAlpin* (1991) 53 Cal.3d 1289 (*McAlpin*), which dealt with expert testimony explaining why *parents* might refrain from reporting known child molestation to law enforcement.  Citing *Bowker* and other cases, *McAlpin* observed that "expert testimony on the common reactions of child molestation victims is not admissible to prove that the complaining witness has in fact been sexually abused; [but] it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation." (*McAlpin,* at p. 1300.)  The court went on to explain that rehabilitative testimony was " 'needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional

---

[11]    Shultz's testimony in this case may have sometimes veered into offering a profile of child *molesters* rather than addressing myths or misconceptions about child *victims* bearing on their credibility.  For example, in describing how grooming might coerce compliance, Shultz explained that a sex offender's "goal is to try to isolate that child," build trust, and make "that child feel important and special" before crossing physical boundaries.  She suggested that an abuser might start talking to a victim about sex or show pornography to desensitize them or progress over time into more severe sexual contact.  She further opined that molesters "want to find the kid that's not going to tell . . . that they can keep compliant."  Deneef did not object and, rather than challenge aspects of Shultz's testimony on appeal, claims CSAAS-related evidence is *categorically* inadmissible.

antecedents of abused children's seemingly self-impeaching behavior.' " (*Id.* at p. 1301.)

Asking that we adopt a different view, Deneef cites a Kentucky Supreme Court decision categorically barring the admission of CSAAS-related evidence. (*King v. Commonwealth* (Ky. 2015) 472 S.W.3d 523, 528–530.) But as he concedes, most jurisdictions have instead "rendered decisions that are consistent with *McAlpin*." (*People v. Munch* (2020) 52 Cal.App.5th 464, 472 (*Munch*); see e.g., *People v. Beckley* (Mich. 1990) 456 N.W.2d 391, 399 ["evidence of behavioral patterns of sexually abused children is admissible 'for the narrow purpose of rebutting an inference that a complainant's postincident behavior was inconsistent with that of an actual victim of sexual abuse, incest or rape' "]; *People v. Williams* (N.Y. 2013) 987 N.E.2d 260, 263 [expert testimony is admissible " 'to explain behavior of a victim that might appear unusual or that jurors may not be expected to understand' "].) As the Appeals Court of Massachusetts summarized, expert testimony is admissible where it "explains to the jury that child abuse victims may behave in ways that to lay persons may seem illogical. The jury may then factor that advice into its deliberation, while still preserving its role as the ultimate decision maker with respect to child witnesses' credibility. On the other hand, expert testimony that describes what a typical victim looks or acts like, and that suggests that child victims in a particular case have acted typically when compared to a 'norm' of child victims, may not be admitted." (*Commonwealth v. Deloney* (Mass.App. 2003) 794 N.E.2d 613, 621–622.)

Deneef suggests that the admission of expert testimony regarding CSAAS violates Evidence Code section 801, subdivision (a) because it "is not helpful to the trier of fact . . . and invades the province of the jury to decide credibility." That statute permits expert testimony if "[r]elated to a subject

that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).)  But " '[t]he jury need not be wholly ignorant of the subject matter of the opinion in order to justify its admission,' " and expert testimony will be excluded under this statute " 'only when it would add nothing at all to the jury's common fund of information, i.e., when "the subject of inquiry is one of such common knowledge that men of ordinary education could reach a conclusion as intelligently as the witness" ' [citation]." (*McAlpin, supra,* 53 Cal.3d at pp. 1299–1300.)  For similar reasons that *McAlpin* found expert testimony explaining parental failure to report relevant, testimony explaining why children may delay reporting or make inconsistent or partial disclosures would, in the appropriate case, " 'assist the trier of fact' (Evid. Code, § 801, subd. (a)) by giving jurors information they needed to objectively evaluate [a complaining witness's] credibility." (*McAlpin*, at p. 1302.)

In short, unless and until the Supreme Court revisits *McAlpin*, stare decisis requires us to reject Deneef's claim that expert testimony related to CSAAS is categorically inadmissible. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455; see, e.g., *Munch, supra,* 52 Cal.App.5th at p. 468 ["CSAAS evidence has been admitted by the courts of this state since the 1991 *McAlpin* decision."].)  Instead, reaffirming the strict limits we placed on such evidence in *Bowker*, expert testimony may be admitted where it is tailored to disabusing jurors of myths or misconceptions regarding molestation victims suggested by the evidence that might rationally bear on the complaining witness's credibility.  Because we find no error, we do not reach Deneef's claim that in a close case such as this, the admission of Shultz's testimony was prejudicial.

14

B.    *No Instructional Error Occurred.*

Deneef argues the court erred by instructing the jury with CALCRIM No. 1193 to evaluate Shultz's testimony.  He contends that in a case turning on Savanna's credibility, the instruction indirectly invited jurors to consider the testimony to prove Deneef's guilt vis-à-vis Savanna's credibility and impermissibly lessened the prosecution's burden of proof.  Suffice to say, we agree with courts that have rejected identical claims.  (*People v. Lapenias* (2021) 67 Cal.App.5th 162, 175–176; *Munch, supra,* 52 Cal.App.5th at pp. 473–474; *People v. Gonzales* (2017) 16 Cal.App.5th 494, 504.)  Where CSAAS-related testimony is appropriately tailored to dispel a myth or misconception bearing on the complaining witness's credibility, CALCRIM No. 1193 properly directs the jury to consider it for that limited credibility purpose and not in deciding whether molestation in fact occurred.

C.    *The $154 Criminal Justice Administration Fee Must Be Vacated.*

As of July 1, 2021, the provision under which the trial court ordered Deneef to pay a $154 criminal justice administration fee (commonly referred to as a "booking fee") was repealed.  (Stats. 2020, ch. 92, § 22 (Assem. Bill No. 1869) [deleting Gov. Code, § 29550, former subdivision (c)].)[12]  Deneef argues that under *In re Estrada* (1965) 63 Cal.2d 740, he is entitled to retroactive application of the amended statute and asks us to strike the fee.  The People respond that as of July 1, 2021, the fee became uncollectable

---

[12]    In enacting Assembly Bill No. 1869, the Legislature sought "to eliminate the range of administrative fees that agencies and courts are authorized to impose to fund elements of the criminal legal system and to eliminate all outstanding debt incurred as a result of the imposition of administrative fees."  (Stats. 2020, ch. 92, § 2.)  The bill "abrogated the authority to impose and collect 23 different administrative fees" (*People v. Greeley* (2021) 70 Cal.App.5th 609, 626 (*Greeley*)), including as relevant here, the criminal justice administration fee.

15

pursuant to Government Code section 6111, conferring "automatic relief" without further need for action by this court.

We recently addressed this issue in *People v. Lopez-Vinck* (2021) 68 Cal.App.5th 945, 953–954 as to a virtually identical criminal justice administration fee imposed under Government Code former section 29550.1, which was also repealed by Assembly Bill No. 1869. Because the same legislation that repealed this fee enacted Government Code section 6111 to address fees that *remain outstanding* as of July 1, 2021, we held that the *Estrada* rule did not apply. (*Lopez-Vinck*, at p. 953.) We did not, however, accept the People's view that the judgment could simply be affirmed. Government Code section 6111, subdivision (a) not only made outstanding amounts uncollectable, but also provided that " 'any portion of a judgment imposing those costs *shall be vacated*.' " (*Lopez-Vinck,* at p. 953 [quoting statute].) We decided this meant that the criminal justice administration fee in that case had to be vacated. The Sixth Appellate District recently reached the same conclusion. (*Greeley, supra,* 70 Cal.App.5th at pp. 626–627.) Consistent with our approach in *Lopez-Vinck*, we vacate any balance of costs imposed pursuant to Government Code section 29550, former subdivision (c) that remains unpaid as of July 1, 2021.

16

DISPOSITION

The portion of the criminal justice administration fee imposed by the court pursuant to Government Code section 29550 that remains unpaid as of July 1, 2021 is vacated.  As so modified, the judgment is affirmed.  The matter is remanded for the court to amend the abstract of judgment to reflect this fee vacatur and forward a copy of the same to the Department of Corrections and Rehabilitation.


DATO, J.

WE CONCUR:


McCONNELL, P. J.


DO, J.

17